UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MIAMI DOLPHINS, LTD. and
SOUTH FLORIDA STADIUM LLC,

           Plaintiffs,

vs.

FIRST CLASS CRUISES, LLC and
JEFFREY NAHOM, individually,

           Defendants.

Civil Case No. _____

# COMPLAINT

Plaintiffs, Miami Dolphins, Ltd., a Florida limited partnership, and South Florida Stadium LLC, a Florida limited liability company (collectively, the "Dolphins Parties") sue Defendants First Class Cruises, LLC ("FCC") and Jeffrey Nahom and state as follows:

## NATURE OF THE ACTION

1. This is an action to recover damages against Defendants FCC and Nahom resulting from breach of contract, promissory estoppel, unjust enrichment, and fraudulent misrepresentations.

2. In June 2022, FCC and the Dolphins Parties entered into a Sponsorship Agreement (the "Agreement") in connection with FCC's efforts to organize and operate a cruise marketed as a "Miami Dolphins Fan Cruise" (the "Fan Cruise"). A copy of the Agreement is attached as Exhibit 1.

3. FCC defaulted under the Agreement and otherwise failed to fulfill its contractual obligations to the Dolphins Parties.

4. Specifically, under the Agreement, FCC promised, but failed, to pay the Dolphins Parties hundreds of thousands of dollars for sponsorship benefits and player appearance fees.

5. Moreover, in the months leading up to the Fan Cruise, FCC and Nahom repeatedly assured the Dolphins Parties that FCC had satisfied its obligations to the non-party cruise operator, MSC Cruises S.A. ("MSC"), and that FCC did not have any other outstanding liabilities that would affect the quality of the Fan Cruise. As it turned out, FCC and Nahom knowingly misrepresented the status of the payments that FCC had made to MSC.

6. Less than one month before Miami Dolphins fans were scheduled to board the Fan Cruise, FCC and Nahom confessed to the Dolphins Parties that FCC had not secured any of the staterooms for the 35 former Miami Dolphins players participating in the Fan Cruise, as FCC was required to do under the Agreement.

7. Even worse, FCC informed the Dolphins Parties that it had not paid MSC for dozens of staterooms for which Miami Dolphins fans already had paid FCC. Instead, FCC misappropriated those funds, leaving fans without any reservation on the Fan Cruise despite those fans having paid thousands of dollars to FCC for their bookings.

8. To avert a last-minute cancellation of the Fan Cruise, the Dolphins Parties directly paid MSC for all the remaining player and fan staterooms. They did so in reliance on promises and assurances made by both FCC and Nahom personally that they would reimburse the Dolphins Parties if they helped "salvage" the Fan Cruise. Neither FCC nor Nahom has reimbursed the Dolphins Parties for the money that the Dolphins Parties paid to MSC on FCC's behalf.

9. These remaining staterooms, however, were not the only expenses FCC failed to pay. FCC had promised Fan Cruise passengers that their bookings included free Wi-Fi and MSC's Easy Plus beverage package. During the Fan Cruise, however, the Dolphins Parties discovered

that FCC had failed to pay MSC for these amenities in connection with many Fan Cruise passengers' bookings. FCC took full responsibility for this amount and repeatedly represented to the Dolphins Parties that FCC would make this payment. FCC did not. The Dolphins Parties thus were forced to pay MSC to ensure Fan Cruise passengers received Wi-Fi and beverage packages for which those passengers already had paid FCC. Neither FCC nor Nahom has reimbursed the Dolphins Parties for the additional amounts that the Dolphins Parties paid to MSC on FCC's behalf.

10. In total, Defendants FCC's and Nahom's conduct—which deceived both the Dolphins Parties and their loyal fans—has caused the Dolphins Parties to suffer actual losses totaling no less than $849,110.53, as well as significant reputational harm.

## PARTIES, JURISDICTION AND VENUE

11. Plaintiff Miami Dolphins, Ltd. is a Florida limited partnership with its principal place of business in Miami Gardens, Florida. Plaintiff Miami Dolphins, Ltd.'s partners are citizens of California, New York, and Florida.

12. Plaintiff South Florida Stadium LLC is a Florida limited liability company with its principal place of business in Miami Gardens, Florida. Plaintiff South Florida Stadium LLC's members are citizens of California, New York and Florida.

13. Defendant Jeffrey Nahom is a resident of Newtown, Pennsylvania. Nahom purports to be the managing member and president of FCC.

14. Defendant FCC is a Nevada limited liability company with its principal place of business in Newtown, Pennsylvania. On information and belief, Nahom, a citizen of Pennsylvania, is FCC's sole member.

15. FCC is an undercapitalized business entity that acts as the alter ego of Nahom. Nahom established FCC for the improper purpose of misrepresenting to third parties, such as the

3

Dolphins Parties, that Nahom represented a corporate entity with the requisite experience, connections, personnel, and financial resources to manage large-scale travel experiences, such as the Fan Cruise.

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. As described in paragraphs 11–14, there is complete diversity between Plaintiffs Miami Dolphins, Ltd. and South Florida Stadium LLC, which are each citizens of California, New York, and Florida, and Defendants Nahom and FCC, which are each citizens of Pennsylvania.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

18. Moreover, the Agreement expressly states that "[j]urisdiction and venue for any legal proceedings arising from, relating to, or in connection with this Agreement shall exclusively lie in the state and federal courts situated in Miami-Dade County, Florida." Indeed, by entering into the Agreement, FCC "waive[d] any objection based on venue or forum non conveniens with respect to any proceedings instituted" in this Court.

19. This Court also has personal jurisdiction over FCC and Nahom under Florida's long-arm statute because the Defendants' conduct giving rise to the Dolphins Parties' claims occurred in, or was directed to, the State of Florida. Moreover, in the Agreement, FCC agreed that it would be subject to personal jurisdiction in the State of Florida "for any legal proceedings arising from, relating to, on in connection with" the Agreement.

**FACTUAL BACKGROUND**

I. **FCC Enters Into the Agreement with the Dolphins Parties.**

20.     On June 14, 2022, FCC and the Dolphins Parties entered into the Agreement.

21.     Nahom signed the Agreement on behalf of FCC.

22.     The Agreement provides that any disputes arising from, relating to, or in connection with the Agreement are to be governed by and construed in accordance with the laws of the State of Florida.

23.     The Agreement's original term was June 1, 2022, through March 31, 2025. The Agreement included three separate contract years. The 2022 Contract Year ran from June 1, 2022 through March 31, 2023. The 2023 Contract Year commenced on April 1, 2023 and was supposed to run through March 31, 2024. The 2024 Contract Year was supposed to begin on April 1, 2024 and continue through March 31, 2025.

24.     In the Agreement, FCC promised to pay Miami Dolphins, Ltd. certain fees in each of the Contract Years (the "Cash Payments") in exchange for various benefits that Miami Dolphins, Ltd. agreed to provide in support of the Fan Cruise. Under the Agreement, for the 2022 Contract Year, FCC agreed to pay Miami Dolphins, Ltd. a total Cash Payment of $525,000, broken into three installments of $175,000 each. The first installment was due on or before August 13, 2022, the second installment was due on or before October 1, 2022, and the third installment was due on or before December 1, 2022.

25.     In addition to the Cash Payments, FCC also promised to pay the Dolphins Parties appearance fee budgets for each of the Contract Years (the "Appearance Fee Budgets"). For the 2022 Contract Year, FCC agreed to pay a $300,000 Appearance Fee Budget. The Dolphins Parties had sole discretion as to how to allocate the Appearance Fee Budget.

26. Under the Agreement, FCC also promised to provide each current or former Miami Dolphins player participating in the Fan Cruise a complimentary stateroom for two guests. FCC promised that the staterooms provided to the current or former Miami Dolphins players participating in the Fan Cruise would include all food, non-alcoholic beverages, taxes, fees, gratuities, and surcharges. FCC agreed that the Dolphins Parties and each participating current or former Miami Dolphins player participating in the Fan Cruise would not need to pay any additional amounts, except that such parties were responsible for any additional fees associated with upgraded dining options on the Fan Cruise.

27. The Agreement also incorporated a number of other agreed-upon terms and conditions, including, among others, a provision governing late payment remedies, an indemnification provision, a provision governing notice of contractual default, a choice-of-law provision in which the parties agreed to Florida state law, and a forum-selection clause dictating that jurisdiction and venue "shall exclusively lie in the state and federal courts situated in Miami-Dade County, Florida."

## II.  FCC Sells the 2022 Fan Cruise.

28. Pursuant to the Agreement, on Thursday, July 21, 2022, Miami Dolphins, Ltd. issued a press release announcing the inaugural Fan Cruise.

29. FCC conducted a pre-sale beginning on July 21, 2022, and started selling cruises to the general public on July 22, 2022.

30. Between July 21, 2022, and February 4, 2023, FCC purportedly sold 259 staterooms aboard the Fan Cruise.

31. FCC represented that the Fan Cruise included, among other things, "room gratuities and main dining room gratuities" and "MSC's Easy Plus beverage package." FCC also represented that "Wi-fi is free for everyone in the Miami Dolphins Fan Cruise group." FCC further represented

6

that the Fan Cruise included "all the special events with the Miami Dolphins players, activities, and competitions."

### III. FCC Fails to Make Payments to the Dolphins Parties.

32. On August 26, 2022, FCC made the first Cash Payment of $175,000 to Miami Dolphins, Ltd. for the 2022 Contract Year.

33. Thereafter, FCC failed to make the second and third Cash Payments to the Miami Dolphins, Ltd. for the 2022 Contract Year on or before the Agreement's due dates.

34. In or around November 2022, FCC requested, and the Dolphins Parties agreed to provide, additional benefits for the 2022 Contract Year, including, among other benefits: (1) a four-week co-branded social media campaign; (2) additional thirty-second commercial spots on the Miami Dolphins, Ltd.'s 5th Quarter and Fish Tank programs; (3) additional radio commercial spots; and (4) additional radio appearances by 12 former Miami Dolphins players. In exchange for these additional benefits, FCC promised to pay an incremental fee of $30,000, which the parties planned to memorialize in an amendment to the Agreement.

35. On December 22, 2022, Nahom and representatives from the Dolphins Parties participated in a meeting at Hard Rock Stadium where the parties discussed, among other topics, FCC's failure to pay the second and third Cash Payments for the 2022 Contract Year.

36. On December 28, 2022, Nahom emailed the Dolphins Parties acknowledging that FCC owed the Dolphins Parties more than $650,000 for the 2022 Contract Year, proposing a revised payment schedule, and requesting that the Dolphins Parties provide additional benefits beyond those agreed to by the parties in November 2022, including a press release and an email blast promoting the 2022 Contract Year Fan Cruise.

37. Following further discussions between the parties, on January 5, 2023, Nahom reiterated his request for the Dolphins Parties to provide the additional benefits requested in his

December 28, 2022 email. Nahom promised that, if the Dolphins Parties delivered the press release and email blast, FCC would "be able to pay off our entire invoice within as little as 2–3 weeks" and that "[r]egardless, we will have all Dolphins invoices paid off in full by the end of February."

38. On January 6, 2023, FCC made a partial second payment of $100,000. After this payment, FCC still owed the Dolphins Parties $550,000 under the Agreement—$250,000 in past-due Cash Payments and $300,000 for the 2022 Contract Year Appearance Fee budget.

39. On January 13, 2023, Nahom represented that he knew "from past experience that the press release and email blast" he was requesting "will sell more than enough cabins" to cover FCC's obligations under the Agreement and "provide sufficient cash flow to make the entire event a huge success."

40. On January 17, 2023, the Dolphins Parties responded to Nahom's email and requested that he provide additional information. Specifically, the Dolphins Parties requested that Nahom provide information regarding potential refunds to fans who already had booked in the event that the Fan Cruise were canceled by either FCC or MSC. The Dolphins Parties also requested information regarding FCC's ability to satisfy its outstanding contractual obligations under the Agreement.

41. Nahom responded the next day, assuring the Dolphins Parties that FCC was not going to cancel the Fan Cruise. Nahom also represented to the Dolphins Parties that "[a]ll booked guests are paid for and therefore the cruise line cannot cancel us." Nahom further represented that "[a]ll venues, meals and alcohol are included in our cruise contract and there is nothing additional that needs to be paid to the cruise line to run our events. We will have our own staff on board plus

a professional event management coordinator to manage the events in coordination with an internal team assigned to us by the cruise line."

42. With respect to FCC's outstanding obligations under the Agreement, Nahom again assured the Dolphins Parties that if Miami Dolphins, Ltd. delivered the email blast and press release that Nahom had requested, "we will be able to pay our sponsorship fee within 2 weeks." Further, Nahom promised to pay $150,000 of the 2022 Contract Year Appearance Fee Budget on February 13, 2023, and the other $150,000 on February 20, 2023.

## IV. The Parties Amend the Agreement.

43. On January 20, 2023, in reliance on Nahom's promises and assurances, the Dolphins Parties agreed to amend the Agreement (the "Amendment"). A copy of the Amendment is attached as Exhibit 2.

44. In the Amendment, Miami Dolphins, Ltd. both (i) memorialized the additional benefits that the parties negotiated in November 2022 and (ii) promised to provide the additional press release and email blast promoting the 2022 Contract Year Fan Cruise that Nahom had requested in his December 2022 and January 2023 emails.

45. In consideration for these additional benefits, FCC agreed to increase the total Cash Payments to Miami Dolphins, Ltd. for the 2022 Contract Year by $30,000, from $525,000 to $555,000.

46. The Amendment also revised the deadlines for the 2022 Contract Year Cash Payments to align with the dates on which FCC had made the two previous Cash Payments and to reflect Nahom's promise that Miami Dolphins, Ltd. would receive the final Cash Payment of $280,000 on or before February 10, 2023.

9

47. The Amendment also incorporated Nahom's promise that the Dolphins Parties would receive the $300,000 Appearance Fee Budget for the 2022 Contract Year in two equal installments of $150,000, the first by February 13, 2023 and the second by February 20, 2023.

V. **FCC Again Fails to Pay.**

48. On or about February 8, 2023—less than three weeks after the Amendment was signed and two days before the final Cash Payment was due—FCC informed the Dolphins Parties that it would not be able to pay the $280,000 Cash Payment.

49. FCC represented to the Dolphins Parties that, while it could not pay the Dolphins Parties at that time, "many of the large costs have been paid already, including the cruise line."

50. In response to the Dolphins Parties' inquiry as to whether FCC had any other liabilities "that it cannot pay that will impact the quality of the cruise or FCC's ability to pay the Dolphins what is owed over time," FCC said: "The short answer is No."

51. FCC "recognize[d] that there [was] legitimate frustration and dissatisfaction with FCC based on the payment issues," but assured the Dolphins Parties that FCC was "not running from its obligations nor trying to get out from under them."

VI. **The Dolphins Parties Discover That Nahom and FCC Failed to Secure Staterooms.**

52. Less than one month before the Fan Cruise's scheduled departure date, Nahom informed the Dolphins Parties that FCC, in fact, had not secured all of the staterooms necessary for the Fan Cruise.

53. Contrary to FCC's previous assurances that it already had paid for all of the staterooms that had been booked by Miami Dolphins fans, FCC had not secured 61 staterooms for which Miami Dolphins fans already had paid FCC.

54. And contrary to FCC's previous assurances that there were no other liabilities that would impact the quality of the cruise, FCC had not secured any of the Dolphins Parties'

10

staterooms, as required by paragraph 3.c of the Agreement. Indeed, as of March 6, 2023, FCC had failed to secure any of the staterooms for the 35 former players who were central to the Fan Cruise.

**VII.     The Dolphins Parties Pay to Avert a Last-Minute Cancellation of the Fan Cruise.**

55.     At about 2 p.m. on March 6, 2023, Nahom emailed the Dolphins Parties and informed them that they "must act now to salvage everything." Specifically, Nahom requested that the Dolphins Parties step in and pay MSC to ensure that MSC did not release to the general public the staterooms that FCC had committed to provide Miami Dolphins fans and players. Nahom told the Dolphins Parties that "MSC is holding cabins [sic] needed but will release them soon" and Nahom "need[ed] to get back to MSC [that] afternoon." Nahom promised the Dolphins Parties that "every penny will get paid back" and stated that "the alternative is much worse for everyone."

56.     In a separate email, FCC's counsel also represented that "if the final rooms are secured," FCC "will be able to pay that money back to the Dolphins."

57.     Finally, in further correspondence on March 6, 2023, Nahom stated, "I take full responsibility for the situation I've put the Dolphins organization in" and again assured the Dolphins Parties that he would "pay the Dolphins back every penny."

58.     The Dolphins Parties thus worked with MSC to resolve the issue. After consulting with both FCC and MSC, the Dolphins Parties determined that FCC owed MSC $251,371.62 for the remaining staterooms. Based on the assurances and promises made by both FCC and Nahom personally, the Dolphins Parties paid MSC the outstanding balance of $251,371.62 to ensure that Miami Dolphins fans and players would have accommodations aboard the Fan Cruise.

**VIII.  Nahom and First Class Cruises, LLC Again Fail to Deliver on Their Promises.**

59. The Fan Cruise set sail from Miami on Sunday, April 2, 2023.

60. During the cruise, Nahom's and FCC's performance failed to reflect the Dolphins Parties' organizational values and customer-service focus.

61. Indeed, by Nahom's own admission, the Fan Cruise got off to a "rocky start." Nahom admitted that "many complaints arose from FCC issues." Nahom also admitted that he "seriously thought about disembarking at one of the ports" because of the number of issues with which he was dealing as a result of FCC's performance.

62. In fact, by Wednesday, April 5, 2023, the Fan Cruise passengers' dissatisfaction with Nahom's and FCC's performance became so palpable that the third-party professional events coordinator and her team, with whom FCC did not even have a written contract, threatened to quit and disembark the cruise, despite there still being three nights left.

63. The Dolphins Parties also discovered that, while the bookings FCC sold to fans were supposed to include MSC's Easy Plus beverage package and free Wi-Fi, FCC had not paid MSC for such amenities in connection with many bookings. During the Fan Cruise, Nahom acknowledged that FCC was responsible for, and would pay MSC, the outstanding amounts due. On April 6, 2023, however, after Nahom repeatedly failed to make the necessary payments, the Dolphins Parties paid MSC an additional $17,738.91 to ensure that Miami Dolphins fans who had purchased and paid for such amenities through FCC were able to continue using those amenities during the cruise.

64. The Dolphins Parties further discovered that—instead of using the funds that FCC had collected to secure fan and player staterooms, or fulfill FCC's other contractual obligations to the Dolphins Parties—Nahom had booked for himself and his family, as well as other FCC

personnel, MSC Yacht Club staterooms—the most expensive, luxurious accommodations onboard MSC's cruise ship.

### IX. The Dolphins Parties Provide Notice of Default and Terminate the Agreement.

65. The Agreement's Fees and Expenses provision states:

> In the event any installment of the Fee is not received on or before the applicable due date, the Dolphins Parties may consider said failure to pay a material breach, and may elect to charge Sponsor a late fee of one and one-half percent (1.5%) per month (or the highest amount permitted by law) of the payment then due and owing until it is paid in full. Sponsor acknowledges and agrees that any such election of remedies does not waive any other remedies for breach of contract available to the Dolphins Parties under this Agreement or otherwise at law or equity.

Exhibit 1, at Exhibit A - 1.

66. The Agreement's Default provision states, in relevant part:

> Without prejudice to any other rights, the Dolphins Parties shall have the right to terminate this Agreement upon written notice to Sponsor if: (a) Sponsor fails to perform or comply with any material term or condition of this Agreement (including, without limitation, any representation or warranty contained herein) within five (5) calendar days following delivery of written notice to Sponsor stating such failure or failures; provided that any such failure remains uncured at the end of such period; and further provided that the Dolphins Parties may terminate immediately upon written notice if such failure to perform or comply is not reasonably capable of being cured, as determined by the Dolphins Parties . . . .

Exhibit 1, at Exhibit A - 3.

67. As of April 10, 2023, the Monday after the Fan Cruise returned to Miami, FCC still had not paid the Dolphins Parties either the outstanding $280,000 Cash Payment or the $300,000 Appearance Fee Budget, for a total of $580,000.

68. On April 10, 2023, the Dolphins Parties notified FCC of its default (the "Default Notice"). A copy of the Default Notice is attached as Exhibit 3. The Default Notice was received by Nahom by email on April 10, 2023 and by Federal Express Priority Overnight mail on April 12, 2023.

69. In the Default Notice, the Dolphins Parties also demanded reimbursement of payments that the Dolphins Parties made directly to MSC on FCC's behalf, including the $251,371.62 the Dolphins Parties had paid MSC in March 2023 for the remaining staterooms, as well as the $17,738.91 that the Dolphins Parties paid MSC during the Fan Cruise to avoid interruption of services for which Miami Dolphins fans already had paid FCC.

70. In response to the Default Notice, Nahom acknowledged that his and FCC's actions caused the Dolphins Parties to be put at "financial [and] reputational risk."

71. As of April 17, 2023, the Dolphins Parties had not received any of the $580,000 in outstanding contractual payments owed by FCC. And, neither FCC nor Nahom had reimbursed the Dolphins Parties for the payments made directly to MSC.

72. Therefore, pursuant to the terms of the Agreement, on April 18, 2023, the Dolphins Parties sent a written notice of termination (the "Termination Notice"). A copy of the Termination Notice is attached as Exhibit 4.

## COUNT I – BREACH OF CONTRACT
## (AGAINST DEFENDANT FIRST CLASS CRUISES, LLC)

73. The Dolphins Parties incorporate by reference the allegations in Paragraphs 1 through 72 above as though fully set forth herein.

74. The Dolphins Parties and FCC entered into a written Agreement, effective June 1, 2022, which Agreement was amended, effective January 20, 2023. *See* Exhibits 1 and 2.

75. Under the terms of the Agreement, as amended, FCC was contractually obligated to pay the Dolphins Parties for the 2022 Contract Year Cash Payments totaling $555,000 and an Appearance Fee Budget totaling $300,000.

76. FCC has failed to pay the Dolphins Parties $280,000 of the Cash Payment and has not paid the Dolphins Parties any of the $300,000 Appearance Fee Budget.

77. FCC's failure to make such payments constitutes a material breach of the Agreement.

78. Because of FCC's material breach of the Agreement, the Dolphins Parties have suffered damages of $580,000, plus interest accruing from the date each payment was due, as expressly contemplated in the Agreement.

79. Further, pursuant to the Agreement, FCC was contractually obligated to provide each current or former Miami Dolphins player, who were central to the Fan Cruise experience, with complimentary staterooms.

80. FCC failed to provide complimentary staterooms to the 35 former Miami Dolphins players participating in the Fan Cruise. Instead, on March 7, 2023, to avert a last-minute cancellation of the Fan Cruise, the Dolphins Parties were forced to pay MSC directly to procure staterooms for the 35 former Miami Dolphins players participating in the Fan Cruise.

81. FCC's failure to provide the complimentary rooms aboard the Fan Cruise was a material breach of the Agreement.

82. As a result of FCC's material breach of the Agreement related to its failure to procure staterooms for the 35 former Miami Dolphins players participating in the Fan Cruise, the Dolphins Parties suffered $96,003.92 in damages.

WHEREFORE, the Dolphins Parties respectfully request that the Court enter judgment in favor of the Dolphins Parties and against FCC and award the Dolphins Parties damages, prejudgment and post-judgment interest, costs, expenses, attorney's fees, and any other further relief that the Court deems equitable, just, and proper.

## COUNT II – PROMISSORY ESTOPPEL
## (AGAINST DEFENDANTS FIRST CLASS CRUISES, LLC AND JEFFREY NAHOM)

83. The Dolphins Parties incorporate by reference the allegations in Paragraphs 1 through 72 above as though fully set forth herein.

84. Less than one month before the Fan Cruise was set to disembark from Miami, on March 6, 2023, Nahom emailed the Dolphins Parties to inform them that they "must act now to salvage everything." Specifically, Nahom requested that the Dolphins Parties step in and pay MSC for staterooms that had not yet been secured by FCC for the upcoming Fan Cruise, contrary to FCC's contractual obligations and previous representations made by both Nahom and FCC.

85. Nahom promised the Dolphins Parties that "every penny will get paid back" and stated that "the alternative is much worse for everyone." In response to further inquiries from the Dolphins Parties, Nahom wrote that he took "full responsibility for the situation [he had] put the Dolphins organization in" and again promised that he would "pay the Dolphins back every penny." Separately, FCC's counsel also emailed the Dolphins Parties and stated that "if the final rooms [were] secured," FCC would "be able to pay that money back to the Dolphins."

86. Nahom and FCC expected that such promises would induce the Dolphins Parties to pay MSC directly in order to avert canceling the Fan Cruise at the last minute.

87. In reliance on the promises made by both FCC and Nahom personally, the Dolphins Parties paid MSC $251,371.62 to secure the staterooms that FCC, despite its contractual obligations and despite having been already paid for those staterooms by Miami Dolphins fans, had failed to procure.

88. Injustice can be avoided only by holding FCC and Nahom to their promises to reimburse the Dolphins Parties for the payments that the Dolphins Parties made to MSC on FCC's behalf to secure the remaining staterooms necessary for the Fan Cruise.

WHEREFORE, the Dolphins Parties respectfully request that the Court enter judgment in favor of the Dolphins Parties and against FCC and Jeffrey Nahom and award the Dolphins Parties damages, prejudgment and post-judgment interest, costs, expenses, and any other further relief that the Court deems equitable, just, and proper.

## COUNT III – UNJUST ENRICHMENT
## (AGAINST DEFENDANT FIRST CLASS CRUISES, LLC)

89. The Dolphins Parties incorporate by reference the allegations in Paragraphs 1 through 72 above as though fully set forth herein.

90. On March 6, 2023, less than one month before the Fan Cruise was scheduled to leave Miami, Nahom emailed the Dolphins Parties and requested that the Dolphins Parties pay MSC for staterooms that had not yet been secured by FCC for the upcoming Fan Cruise, contrary to FCC's contractual obligations and previous representations made by both Nahom and FCC.

91. In exchange for the benefits that the Dolphins Parties provided pursuant to the parties' Agreement—which benefits FCC already had accepted—FCC was contractually obligated to provide staterooms to the 35 former Miami Dolphins players participating in the Fan Cruise.

92. Miami Dolphins fans also already had paid FCC for 61 staterooms for which FCC failed to pay MSC.

93. To avoid canceling the Fan Cruise less than one month before its departure, and at the request of Nahom and FCC, the Dolphins Parties paid MSC on FCC's behalf for the remaining staterooms necessary for the Fan Cruise. The Dolphins Parties did so only after receiving assurances and promises that Nahom and FCC would reimburse the Dolphins Parties for these payments.

94. FCC accepted the benefit conferred upon them by the Dolphins Parties payment to MSC for obligations originally owed by FCC. Indeed, FCC already had accepted the benefits the

Dolphins Parties had provided pursuant to the Agreement, as well as the payments previously made by Miami Dolphins fans for these staterooms.

95. It would be inequitable to allow FCC to retain the benefit of the $251,371.62 that the Dolphins Parties paid to MSC on FCC's behalf.

96. Further, during the Fan Cruise, the parties were notified that certain Fan Cruise passengers had not received the Wi-Fi services and MSC Easy Plus beverage packages for which those passengers already had paid FCC.

97. To avoid further harm caused by FCC's failure to arrange for such amenities, the Dolphins Parties paid MSC $17,738.91.

98. It would be inequitable to allow FCC to retain the $17,738.91 that FCC already had been paid by these Fan Cruise passengers, but which FCC failed to pay MSC for such amenities.

WHEREFORE, the Dolphins Parties respectfully request that the Court enter judgment in favor of the Dolphins Parties and against FCC and award the Dolphins Parties damages, prejudgment and post-judgment interest, costs, expenses, and any other further relief that the Court deems equitable, just, and proper.

### COUNT IV – FRAUDULENT MISREPRESENTATION
### (AGAINST DEFENDANTS FIRST CLASS CRUISES, LLC AND JEFFREY NAHOM)

99. The Dolphins Parties incorporate by reference the allegations in Paragraphs 1 through 72 above as though fully set forth herein.

100. On January 18, 2023, Nahom represented to the Dolphins Parties that "[a]ll booked guests are paid for and therefore the cruise line cannot cancel us."

101. Nahom further represented that "[a]ll venues, meals and alcohol are included in our cruise contract and there is nothing additional that needs to be paid to the cruise line to run our events."

102. Three weeks later, on February 8, 2023, FCC represented to the Dolphins Parties that "many of the large costs have been paid already, including the cruise line" and that FCC did not have any other liabilities that it could not pay that would affect the quality of the Fan Cruise.

103. In fact, at the time that Nahom and FCC made these representations, Nahom and FCC each knew that: (1) FCC had not paid MSC for all of the staterooms for the Miami Dolphins fans; (2) FCC had not paid MSC for all of the amenities that were supposed to be included with the Fan Cruise bookings; and (3) FCC had not secured the required staterooms for the 35 former Miami Dolphins players participating in the Fan Cruise.

104. Nahom and FCC, however, knowingly misrepresented to the Dolphins Parties the status of payments made to MSC in order to obtain additional benefits from the Dolphins Parties in the Amendment and to ensure that the Dolphins Parties did not terminate the Agreement based on FCC's failure to fulfill its contractual obligations.

105. Based on these misrepresentations, the Dolphins Parties provided the additional benefits requested by FCC.

106. These misrepresentations ultimately caused the Dolphins Parties to pay MSC directly for staterooms and amenities for which FCC was responsible. By the time the Dolphins Parties learned that Nahom and FCC had knowingly made these misrepresentations—less than one month before Miami Dolphins fans were scheduled to embark on the inaugural Fan Cruise—making payments directly to MSC was the only way that the Dolphins Parties could minimize the damages arising from Nahom's and FCC's conduct and the impact on Miami Dolphins fans.

107. Indeed, on March 6, 2023, Nahom admitted that he as fully responsible "for the situation [he had] put the Dolphins organization in." And after the Fan Cruise was over, Nahom

again acknowledged that his and FCC's actions had caused the Dolphins Parties to be put at "financial [and] reputational risk."

108.    As a result of Nahom's and FCC's misrepresentations, the Dolphins Parties suffered no less than $251,371.62 in damages associated with the staterooms for which the Dolphins Parties paid MSC on March 7, 2023, and $17,738.91 in damages associated with the amenities for which FCC failed to pay MSC.

WHEREFORE, the Dolphins Parties respectfully request that the Court enter judgment in favor of the Dolphins Parties and against FCC and Jeffrey Nahom and award the Dolphins Parties damages, prejudgment and post-judgment interest, costs, expenses, and any other further relief that the Court deems equitable, just, and proper.

Dated: April 21, 2023

Respectfully submitted,

By: */s/ Melissa C. Pallett-Vasquez*
Melissa C. Pallett-Vasquez
Fla. Bar No.:  0715816
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 350-2393
Facsimile: (305) 374-7593
Email: mpallett@bilzin.com
Email: eservice@bilzin.com

*Counsel for Plaintiffs Miami Dolphins, Ltd. and South Florida Stadium LLC*