# EXHIBIT 1

## SPONSORSHIP AGREEMENT

SPONSOR: First Class Cruises, LLC, a Nevada corporation

ADDRESS: 154 Jericho Valley Dr.
Newtown, PA 18940

CONTACT PERSON: Jeffrey Nahom
E-MAIL ADDRESS: jeff@firstclasscruises.com

BILLING CONTACT: Ivan Rivera
BILLING E-MAIL: ivan@firstclasscruises.com

## BASIC AGREEMENT

**THIS SPONSORSHIP AGREEMENT**, together with the Terms and Conditions attached hereto as Exhibit A and any other exhibits attached hereto (collectively, this "Agreement"), is entered into by and among Miami Dolphins, Ltd., a Florida limited partnership ("MDL"), and South Florida Stadium LLC, a Florida limited liability company (individually, "Stadium LLC," and collectively with MDL, the "Dolphins Parties"), on the one hand, and the above-named sponsor ("Sponsor"), on the other hand, as of June 1, 2022 (the "Effective Date"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Terms and Conditions attached hereto as Exhibit A ("Terms and Conditions"). In consideration of the respective covenants set forth herein, Sponsor and the Dolphins Parties agree as follows:

1. **Benefits**. Each Contract Year during the Term (except as otherwise stated hereunder), the Dolphins Parties shall provide Sponsor with the following promotional and advertising rights and benefits (collectively, "Benefits"), which Sponsor may use solely to promote or advertise the Fan Cruise (as defined herein) within the Team's Home Marketing Area, with all aspects and elements of each Benefit subject to the Dolphins Parties' prior written approval in each instance and the terms and conditions set forth in this Agreement:

    a. The Dolphins Parties shall provide, or otherwise cause Sponsor to receive:

        i. **Official Designation and Use of Team Marks**. The right to refer to itself as a "Proud Partner of the Miami Dolphins." Such use shall include the limited right to use the Team Marks and collective Team player imagery provided by MDL, subject to the limitations as described hereunder. In addition, MDL shall, upon Sponsor's request, consult with Sponsor regarding licenses of other Team-related creative assets, including, without limitation, photographs, for use in Sponsor advertising and marketing materials, upon mutually agreed-upon terms and conditions.

        ii. **Away Game Sponsorship**. Sponsor shall be recognized as the presenting sponsor of one (1) Team regular season away game, which recognition shall include, at a minimum, the following Benefits in connection with the designated Team game:

            1. Sponsor name and/or logo recognition on: (a) at least four (4) social media posts from the Team's official social media accounts promoting the applicable game (e.g., "It's Game Day", score graphics, game day infographic), (b) weekly press release for applicable game and other press materials, (c) the game day e-mail blasts sent to potential attendees, as determined by the Dolphins Parties, and (d) the Team website promoting the

applicable game, it being understood that such recognition is estimated to generate 2,000,000 impressions collectively;

The applicable Team away game shall be selected by MDL prior to the start of each season, following consultation with Sponsor.

iii. <u>Dolphins Fan Cruise</u>. The Dolphins Parties shall collaborate with Sponsor in connection with one (1) Sponsor-operated cruise during each Contract Year, sailing from and returning to Port Everglades or PortMiami, with a length no longer than seven (7) nights, to be marketed as a "Miami Dolphins Fan Cruise" (the "<u>Fan Cruise</u>"). The Fan Cruise shall take place during March of each Contract Year, with the precise dates to be determined by the Dolphins Parties in consultation with Sponsor. Sponsor shall provide the Dolphins Parties with at least two (2) different date range options for the Fan Cruise at least twelve (12) months prior to the anticipated dates of the Fan Cruise (i.e., no later than March 1 of the Contract Year preceding the Fan Cruise), and the Dolphins Parties shall select their preferred date range within thirty (30) days of their receipt of such options; provided, however, that the dates of the Fan Cruise for the 2022 Contract Year shall be March 12, 2023 – March 19, 2023.

In connection with each Fan Cruise, MDL shall cause Sponsor to receive the following Benefits:

1. *Fan Cruise Logo*. Subject to Section 1(a)(i) herein, Sponsor shall use a mutually agreed-upon MDL Fan Cruise logo ("<u>Fan Cruise Logo</u>") in connection with any promotional, advertising, and marketing materials for the Fan Cruise; provided however, that the parties anticipate the Fan Cruise Logo for the 2022 Contract Year will incorporate elements recognizing the 50th anniversary of the Team's 1972 perfect season.

2. *Fan Cruise Website*. MDL hereby grants to Sponsor non-exclusive, non-assignable, royalty-free license to register and use the domain name www.dolphinsfancruise.com in connection with the operation of the Fan Cruise during the Term (the "<u>Fan Cruise Website</u>"); provided, however, that within thirty (30) days following the expiration or earlier termination of the Agreement, Sponsor shall issue a domain transfer request to a registrar to be identified by the Dolphins Parties. MDL shall provide and secure permission for use on the Fan Cruise Website images of Dan Marino and two (2) other former Team players. Except as expressly set forth herein, Sponsor shall be responsible for any and all costs, expenses, and liabilities relating to such Fan Cruise.

3. *Team Player Participation*. In connection with the Fan Cruise for the 2022 Contract Year, MDL shall use commercially reasonable efforts to cause a minimum of thirty-five (35) former and/or current Team player to participate in such Fan Cruise; provided, however, that a maximum of fifteen (15) former players from the Team's 1972 undefeated season shall count towards the thirty-five (35) player minimum. In connection with the Fan Cruise for the 2023 and 2024 Contract Years, MDL shall use commercially reasonable efforts to cause a minimum of twenty-five (25) former and/or current Team

2

player to participate in each such Fan Cruise. The identity and designation of each former and/or current Team player participating in each Fan Cruise shall be determined by MDL, subject to approval by Sponsor (which approval shall not be unreasonably withheld, conditioned, or delayed). Appearances by former and/or current players during Fan Cruise events (which may include, but are not limited to meet and greets, photo opportunities, Q&A sessions, and football trivia contests) shall be determined by MDL following reasonable consultation with Sponsor.

4. *Dan Marino Participation*. MDL shall use commercially reasonable efforts to cause Dan Marino ("DM") to participate in each Fan Cruise for a minimum of two (2) nights (excluding the night of departure). MDL acknowledges that DM has given a verbal commitment to attend the MDL Fan Cruise that will occur in the 2022, 2023, and 2024 Contract Years. The Dolphins Parties shall notify Sponsor in writing no later than June 1 of each Contract Year if DM is unavailable to attend the Fan Cruise scheduled for such Contract Year (the "Unavailability Notice"). In the event that DM is unavailable, Sponsor shall have the option, in its discretion, to not operate the Fan Cruise during such Contract Year (the "Postponement Option") by providing written notice to the Dolphins Parties within ten (10) days following Sponsor's receipt of the Unavailability Notice. In the event Sponsor exercises the Postponement Option, (i) both parties' obligations under this Agreement shall be suspended for the remainder of the then-current Contract Year and Sponsor shall not be required to make any payment to MDL for that Contract Year, and (ii) the Term shall be extended for one (1) additional Contract Year on the same terms and conditions (including financial terms) as the Contract Year that was suspended due to the Postponement Option. In the event Sponsor elects to proceed with the Fan Cruise notwithstanding DM's unavailability (or if DM becomes unavailable due to extenuating or unforeseen circumstances after June 1 of a given Contract Year), the Dolphins Parties and Sponsor will confer in good faith to review a list of potential replacement players, one of which shall substitute for DM. If the Dolphins Parties issue a second Unavailability Notice during the Term, Sponsor shall have the right to terminate this Agreement (the "Termination Option"). Notwithstanding anything to the contrary in this Agreement, (i) Sponsor shall have no right to exercise a Postponement Option or Termination Option in the event that DM's unavailability is caused by his incapacitation, disability, or death, (ii) MDL's failure to cause DM to participate in a Fan Cruise in any Contract Year shall not be considered a breach of this Agreement; and (iii) Sponsor acknowledges and agrees that its sole remedy for DM's unavailability is set forth in this paragraph.

5. *Home Page Takeover*. For a period of one (1) week, MDL shall run rotating banner advertisements promoting the Fan Cruise on the Team's primary website (currently www.miamidolphins.com) as part of home page "takeover" including full-page advertising encouraging Team fans to purchase a stateroom for the Fan Cruise. No other banner advertisements other than those related to the Fan Cruise shall run on the Team's primary website during the one (1) week takeover; provided, however, that Sponsor

3

acknowledges and agrees that advertisements for and references to Team's Stadium naming rights partner (currently, Hard Rock Stadium) may remain on the website. The dates of the takeover shall be determined by MDL in consultation with Sponsor; provided, however, that the parties agree that the takeover will occur within thirty (30) days after the public announcement of the Fan Cruise. Sponsor shall be responsible for the design and production of such banner advertisements in accordance with the specifications provided by MDL, which banner advertisement shall be subject to MDL's prior written approval.

6. *Social Media.* Sponsor name and/or logo recognition in one (1) retargeting campaign from Team's official Facebook and Instagram social media accounts to drive sign-ups for the Fan Cruise, which posts shall be targeted and amplified by MDL pursuant to reasonable targeting and amplification parameters to be determined by MDL in consultation with Sponsor. The timing, platform, and content of each such post shall be determined by MDL in consultation with Sponsor. All logo inclusions will be the MDL and Sponsor approved Fan Cruise Logo. Sponsor shall be responsible for creating the Fan Cruise Logo, which is subject to MDL's prior written approval.

7. *Microsite.* One (1) dedicated microsite promoting the Fan Cruise and allowing for customer comments and reviews of same, which microsite shall reside on MDL's primary URL domain (currently www.miamidolphins.com). Such microsite shall be designed and maintained by MDL, following reasonable consultation with Sponsor and shall include a direct web link to a designated page on the Fan Cruise Website (www.dolphinsfancruise.com) for bookings. Sponsor reserves all rights to control search engine optimization for the Sponsor microsite, subject to the Dolphin Parties consent which shall not be unreasonably withheld.

8. *E-Newsletter.* One (1) banner advertisement promoting the Fan Cruise in five (5) Team-affiliated e-newsletters and five (5) Team Member e-newsletters, with all aspects and elements of such e-newsletters to be determined by MDL following reasonable consultation with Sponsor. Sponsor shall be responsible for the design and production of such banner advertisements, which shall be subject to MDL's prior written approval.

9. *Sizzle Reel.* One (1) two-minute (2:00) short-form digital video sizzle reel (the "Sizzle Reel") for Sponsor to use in connection with its promotion of the Fan Cruise. In addition, Sponsor shall receive three (3) edited versions of the Sizzle Reel in sixty-second (:60), thirty-second (:30), and fifteen-second (:15) durations. Except as expressly provided herein, all aspects and elements of the Sizzle Reel (e.g., concepts, scripts, etc.) shall be determined by MDL, provided, however, that MDL shall consult with Sponsor regarding the incorporation of Sponsor products or services into the Sizzle Reel. MDL shall use commercially reasonable efforts to deliver the Sizzle Reel within twenty (20) business days following full execution of this Agreement.

10. *Press Release.* MDL shall create one (1) press release announcing the Fan Cruise for the 2022 Contract Year celebrating the 50th anniversary of the Team's 1972 perfect season, which Fan Cruise will occur in March of 2023. MDL will create an initial draft and send it to Sponsor for review and approval within ten (10) business days. MDL shall amplify the announcement of Fan Cruise via one (1) social media post from each of the Team's official LinkedIn, Facebook, Instagram, and Twitter accounts within one (1) week of the press release, informing MDL followers about the Fan Cruise to be held in 2023. The nature, content, and timing of such posts shall be determined by MDL in its sole discretion.

b. Stadium LLC shall provide, or otherwise cause Sponsor to receive:

   i. StadiumVision. Eight (8) fifteen-second (0:15) commercial spots (no audio) to run on the StadiumVision in-stadium television network during each Team preseason and regular season home game played at the Stadium and all other Stadium events during which Stadium LLC exercises exclusive control of the in-stadium television network. Sponsor shall be responsible for the production and delivery of such commercials in the format requested by Stadium LLC, which commercials shall be subject to Stadium LLC's prior written approval. The broadcast time for such commercial spots shall be determined by Stadium LLC.

   ii. Tabling. The right to provide, staff and display one (1) promotional table or other mutually agreed-upon promotional displays, not to exceed 10' x 10' ("Promotional Displays"), in or around the Team Activation area on the plaza level of the Stadium, during two (2) Team regular season home games played at the Stadium. The applicable Team home games shall be selected by MDL prior to the start of each season, following reasonable consultation with Sponsor. Sponsor shall supply the Promotional Displays and Stadium LLC shall determine the location of such Promotional Displays. Sponsor agrees to provide two (2) individuals to staff each Promotional Display. Further, Sponsor agrees that such Promotional Displays shall promote only Sponsor products and/or services, and that all promotional activities at such Promotional Displays shall be subject to Stadium LLC's prior written approval. For the avoidance of doubt, neither the Promotional Displays nor any product or service provided or advertised by Sponsor thereat shall include any third-party branding or associations without Stadium LLC's prior written approval. In addition, Sponsor may not conduct sales or sampling from such Promotional Displays. Any Sponsor advertising or promotion of the availability of the Tables at the Stadium shall be subject to Stadium LLC's prior written approval.

c. The Dolphins Parties shall secure from Dolphins Cycling Challenge, Inc. d/b/a Dolphins Challenge Cancer ("DCC"), and provide to Sponsor, or otherwise cause Sponsor to receive, the following Benefits in connection with the annual charitable event held during the Term currently known as the Dolphins Challenge Cancer (the "Event"):

   i. Proud Partner Recognition. DCC shall recognize Sponsor as a "Proud Partner of the Dolphins Challenge Cancer."

5

ii. <u>Event Signage Rotation</u>. Sponsor name or logo recognition on video board and/or other Event signage (as determined by DCC) during the DCC Finish Line Celebration Festival scheduled to take place after the Event.

iii. <u>Event Website</u>. Sponsor name or logo recognition on the "Community Partners" page of the official Event website, currently hosted at https://dolphins.donordrive.com.

iv. <u>Rider Handbook</u>. Sponsor name or logo recognition in the DCC rider handbook.

v. <u>5K Shirt</u>. Sponsor name or logo recognition on the official Event 5K participant t-shirt.

vi. <u>Gift Bag Item</u>. The opportunity to provide one (1) Sponsor-branded give-away item to Event participants in the Event cycling participant gift bag, at Sponsor's sole expense. Such give-away item, including any third-party branding or associations therein, shall be subject to DCC's prior written approval.

vii. <u>Event Activation</u>. The opportunity to conduct certain Sponsor activation during the Friday Kick-off Party held before the Event and the DCC Finish Line Celebration held after the Event. Sponsor agrees to provide, set up, and staff one (1) 10' x 10' promotional tent in connection with such Sponsor activation, at Sponsor's sole expense. Further, any activation by Sponsor shall promote only Sponsor products and/or services.

viii. <u>Event Registrations</u>. DCC shall cause Sponsor to receive ten (10) complimentary Event registrations (each, an "<u>Event Registration</u>") for use by Sponsor designees. Sponsor agrees and acknowledges that any Sponsor designees who utilize such Event Registrations shall be required to: (a) provide certain information required by DCC; (b) complete and sign any customary forms required by DCC (e.g., waivers and releases); and (c) comply with any other customary terms and conditions of participation as established by DCC. Such Event Registrations shall expire immediately upon the conclusion of each Contract Year and may not be used for any other purpose except as expressly provided herein.

ix. <u>Designated Sponsor Picnic Area</u>. One (1) designated area for up to twenty (20) Sponsor designees at the DCC Finish Line Celebration Festival, inclusive of ten (10) friends and family admission passes.

x. <u>Golf Tournament</u>. One (1) complimentary foursome for one (1) DCC golf tournament held each Contract Year, which shall provide the opportunity for a total of three (3) Sponsor designees and one (1) celebrity golfer to participate in such golf tournament. The identity and designation of such celebrity shall be determined by DCC in its sole discretion.

xi. <u>Tournament Gift Bag Item</u>. The opportunity to provide one (1) Sponsor-branded give-away item to DCC golf tournament participants in the tournament participant gift bag, at Sponsor's sole expense. Such give-away item, including any third-party branding or associations therein, shall be subject to DCC's prior written approval.

6

2. **Term**. Unless terminated earlier pursuant to the Terms and Conditions, the term of this Agreement shall be for three (3) Contract Years (as hereafter defined) commencing as of the Effective Date and terminating March 31, 2025 at 11:59 p.m. (EST) ("Term"). "Contract Year" shall mean each twelve (12) month period commencing on April 1 (except for the first Contract Year, which shall commence on the Effective Date) and ending on the immediately following March 31 during the Term, and when used with a year, shall refer to the Contract Year starting in such calendar year (e.g., the 2022 Contract Year shall commence on the Effective Date and conclude on March 31, 2023; the 2023 Contract Year shall commence upon April 1, 2023 and conclude on March 31, 2024; and the 2024 Contract Year shall commence upon April 1, 2024 and conclude on March 31, 2025). Each Contract Year shall include one Fan Cruise of a minimum of seven (7) nights.

3. **Fee**. In consideration of the Benefits, Sponsor shall provide the Dolphins Parties with the following cash payments, appearance fee budget, and in-kind benefits (collectively, the "Fee") during the Term as more particularly described below.

    a. **Cash**. In consideration of the Benefits, Sponsor shall pay the Dolphins Parties an aggregate net fee of One Million Three Hundred Seventy-Five Thousand Dollars ($1,375,000) ("Cash Payment"). All payments under this Agreement shall be made in U.S. dollars. The Cash Payment shall be due and payable over the course of the Term each Contract Year, as follows, except that Sponsor shall not be obligated to make any Cash Payment or otherwise pay any fee to MDL or players, in any Contract Year when a Fan Cruise does not occur due to Sponsor's exercise of a Postponement Option:

| CONTRACT YEAR | DUE DATE | AMOUNT DUE |
|---|---|---|
| 2022 Contract Year | Within sixty (60) days of full execution of this Agreement | $175,000 |
| | October 1, 2022 | $175,000 |
| | December 1, 2022 | $175,000 |
| | | TOTAL: $525,000 |
| 2023 Contract Year | July 1, 2023 | $141,666.67 |
| | October 1, 2023 | $141,666.67 |
| | December 1, 2023 | $141,666.66 |
| | | TOTAL: $425,000 |
| 2024 Contract Year | July 1, 2024 | $141,666.67 |
| | October 1, 2024 | $141,666.67 |
| | December 1, 2024 | $141,666.66 |
| | | TOTAL: $425,000 |
| | **TOTAL:** | **$1,375,000** |

|  | **WIRE INSTRUCTIONS:** |
|---|---|
| Bank: | SunTrust Bank |
|  | 303 Peachtree Street |
|  | Atlanta, GA 30308 |
| Account #: | 1000213302358 |
| Routing #: | 061000104 |
| Swift Code: | SNTRUS3A |
| Acct Name: | Miami Dolphins, Ltd.; Operating Account |

b. Appearance Fee Budget. Sponsor shall be responsible for the payment of appearance fees for all former and/or current Team players participating in each Fan Cruise (the "Appearance Fee Budget"), with the amount and allocation of such Appearance Fee Budget to be determined by the Dolphins Parties in their sole discretion. In connection with the Fan Cruise for the 2022 Contract Year, Sponsor shall pay the Dolphins Parties an Appearance Fee Budget equal to Three Hundred Thousand Dollars ($300,000). In connection with the Fan Cruise for each of the 2023 and 2024 Contract Years, Sponsor shall pay the Dolphins Parties an Appearance Fee Budget equal to Two Hundred Twenty-Five Dollars ($225,000). For the purpose of clarity and avoidance of doubt, the Appearance Fee Budget described in this paragraph shall be cumulative and in addition to the Cash Payment made by Sponsor to the Dolphins Parties during each Contract Year. The Appearance Fee Budget includes all travel expenses to and from the Fan Cruise. Except as otherwise stated in paragraph 3(c) below, Sponsor is not responsible for any onboard expenses or any other expenses related to players.

c. Complimentary Staterooms. Sponsor shall provide each former and/or current Team player participating in the Fan Cruise with a voucher for one (1) complimentary unobstructed balcony stateroom for two (2) guests. Subject to availability, each former and/or current Team player may request and purchase, at his sole cost and expense, an upgraded room in a higher room category than a balcony stateroom, which room may include additional guests (i.e., children); provided, however, that Sponsor shall provide Dan Marino with an upgraded room in a suite category at no additional cost. All vouchers shall be inclusive of all food, non-alcoholic beverages, taxes, fees, gratuities, and surcharges, and the Dolphins Parties and participating former and/or current Team players shall not be required to pay any additional amounts in order to utilize such vouchers; provided, however, that participating former and/or current players and their guest(s) shall be responsible for payment of upgraded dining options such as specialty restaurants. Sponsor shall make commercially reasonable efforts to ensure that all rooms are within a reasonable proximity of each other. Sponsor shall provide the Dolphins Parties with the name, phone number and email address of a dedicated Sponsor contact that the Dolphins Parties may reach at any time during the Cruise in the event of an urgent or emergency situation.

d. Stateroom Sale Bonus. Each Contract Year during the Term, excluding the 2022 Contract Year, Sponsor shall provide the Dolphins Parties with a bonus based on the number of staterooms sold for the Fan Cruise, as follows: for every one hundred (100) staterooms sold in excess of four hundred (400) staterooms, Sponsor shall pay the Dolphins Parties an amount equal to Twenty-Five Thousand Dollars ($25,000) (the "Stateroom Bonus"), which shall be paid on a pro-rata basis. For the purpose of clarity and avoidance of doubt, in the event Sponsor sells five hundred twenty (560) staterooms during a particular Contract Year, Sponsor shall pay the Dolphins Parties a Stateroom Bonus equal to Forty Thousand Dollars

8


($40,000), comprised of Twenty-Five Thousand Dollars ($25,000) for staterooms 401-500 and Fifteen Thousand Dollars ($15,000) for staterooms 501-560. as the Stateroom Bonus.

    e. **Stateroom Discount.** In connection with each Fan Cruise, the Dolphins Parties and their respective members, partners, shareholders, officers, directors, employees, agents and representatives shall be entitled to a stateroom discount equal to ten percent (10%) below the price advertised on the Sponsor Dedicated Fan Cruise Website for a stateroom of the same category.

2. **TERMS AND CONDITIONS.** The Terms and Conditions attached as <u>Exhibit A</u> are incorporated by reference as if fully set forth herein. The parties have carefully read and agree to be bound by the Terms and Conditions. In the event of a direct and express conflict between the provisions of Benefits section of the Basic Agreement and the Terms and Conditions set forth in <u>Exhibit A</u>, the order of precedence shall be as follows: (1) the Terms and Conditions, and then (2) the Benefits section of the Basic Agreement.

**IN WITNESS WHEREOF**, the Dolphins Parties and Sponsor have executed this Agreement as of the dates set forth below.

**FIRST CLASS CRUISES, LLC,**
a Nevada corporation

By: *Jeffrey Nahom* (Jun 14, 2022 10:54 EDT)
Name: Jeffrey Nahom
Title: President
Date: 06/14/2022

**MIAMI DOLPHINS, LTD.**
a Florida limited partnership

By: Jeremy D. Walls (Jun 14, 2022 10:57 EDT)
Name: Jeremy D. Walls
Title: SVP & CRO
Date: 06/14/2022

**SOUTH FLORIDA STADIUM LLC,**
a Florida limited liability company

By: Jeremy D. Walls (Jun 14, 2022 10:57 EDT)
Name: Jeremy D. Walls
Title: SVP & CRO
Date: 06/14/2022

*Approved as to form and legal sufficiency:*

By: *Marc Weinroth*
Office of the General Counsel

9

# EXHIBIT A

# TERMS AND CONDITIONS

1. **FEES AND EXPENSES.**

    a. [*Intentionally omitted.*]

    b. **Late Payment of Fee**. In the event any installment of the Fee is not received on or before the applicable payment due date, the Dolphins Parties may consider said failure to pay a material breach, and may elect to charge Sponsor a late fee of one and one-half percent (1.5%) per month (or the highest amount permitted by law) of the payment then due and owing until it is paid in full. Sponsor acknowledges and agrees that any such election of remedies does not waive any other remedies for breach of contract available to the Dolphins Parties under this Agreement or otherwise at law or equity.

    c. **Costs**. Except as otherwise specifically provided in this Agreement, each of the parties shall pay its own expenses of performing this Agreement, which for Sponsor shall include all design, production and other costs associated with the timely preparation, delivery, installation, activation, removal, and/or destruction of the elements necessary (e.g., digital ads, videos, copy, etc.) to utilize the Benefits (including any changes or updates thereto during the Term), which elements must be provided in the format and upon the deadlines established by the Dolphins Parties. In the event that Sponsor fails to meet any deadlines established by the Dolphins Parties from time-to-time with respect to the design, production, preparation, delivery, installation, activation, removal, and/or destruction of any elements necessary to utilize the Benefits, which failure results in the non-delivery of any Benefit, then, any other provision of this Agreement notwithstanding, Sponsor shall forfeit such Benefit and not be entitled to any refund, make-good, or substitute Benefits.

2. **MARKS & APPROVALS.**

    a. Except as specifically authorized herein, this Agreement does not grant to Sponsor any rights with respect to the use of any service mark, trademark, name, symbol, or other indicia (collectively, "Marks") of MDL, Stadium LLC, Hard Rock Stadium (the "Stadium"), the Miami Dolphins football team (the "Team"), the National Football League (the "NFL"), or its member clubs. In addition, "Official", "Exclusive", and/or similar status designations are reserved by the owner of such Marks unless specifically granted herein. In furtherance of the foregoing, each of the parties hereto agrees that it shall have no right to grant any party the right to use the Marks of the other party either alone or in connection with its Marks or in association with its Marks and the Marks of such third party, except that Sponsor hereby licenses the Dolphins Parties such rights to (i) use Sponsor's Marks as necessary for the Dolphins Parties to provide the Benefits as contemplated herein, and (ii) use and/or permit third parties to use, in perpetuity and via any and all means of media exhibition, whether now known or later developed, any photograph, video or other depiction of the Stadium premises which includes Sponsor's Marks without any additional consent from Sponsor. The Dolphins Parties and Sponsor further agree that they will not at any time do or cause to be done any act or thing, directly or indirectly, which contests or in any way impairs or tends to impair or dilutes or tends to dilute any part of the right, title and interest of the other in its Marks; and the Dolphins Parties and Sponsor shall not, in any manner, represent that it has any ownership interest in the other's Marks or the registrations therefor. For the avoidance of doubt, Sponsor shall not procure or claim any copyright, trademark, or other intellectual property right in any Team or Stadium Marks or make use of such Marks without the prior written approval of the Dolphins Parties in accordance with the terms and conditions set forth herein, and all Marks shall be owned by and registered in the name of the Dolphins Parties or another entity designated by the Dolphins Parties. Except as expressly otherwise stated herein, any and all approvals to be obtained by Sponsor from either or both of the Dolphins Parties (or their designees), and any determinations to be made by either or both of the Dolphins Parties (or their designees), in connection with the Benefits shall, in each instance, be granted, denied, and/or determined in the sole good faith discretion of the approving or determining party.

    b. To the extent Sponsor does have any rights to use the Team or Stadium Marks, or other Team or Stadium intellectual property, pursuant to the terms of this Agreement, any such use shall be subject to the Dolphins Parties' prior written approval in each instance (such approval to be granted or withheld in the Dolphins Parties' sole good faith discretion) and shall be limited to the Team's "Home Marketing Area", as defined by the NFL as of the date hereof. As of the date hereof, the Team's Home Marketing Area means (a) all points within seventy five (75) miles of Miami, Florida, and (b) all other points in the State of Florida that are not within seventy five (75) miles of another NFL team's home city. To the extent Sponsor has the right to use a marketing designation that includes the name of the Stadium or otherwise has the right to use the name of the Stadium in any context, it is understood that any reference to the Stadium must include the full name of the Stadium, including any then-current Stadium naming rights partner.

    c. Notwithstanding anything to the contrary contained in this Agreement, no materials containing Team or Stadium Marks shall be deemed authorized or approved (and Sponsor shall not, or authorize any third party to, commence production or distribution of any such materials) until the Dolphins Parties deliver to Sponsor a writing in which the Dolphins Parties specifically and unconditionally provide Sponsor with "final" approval with respect to such materials (or any other use of Team or Stadium Marks that may be contemplated by this Agreement). The Dolphins Parties will not approve the use of, and Sponsor shall not use or commercially exploit, any rights granted hereunder (i) in a negative manner, (ii) in a way that is contrary to public morals or has a deceptive or misleading effect, (iii) in a manner that compromises or reflects unfavorably upon the good name, goodwill, reputation or image of the Dolphins Parties or any Team players, or (iv) in any manner that may result in the unauthorized use of any intellectual property of the Dolphins Parties.

    d. After a proposed use of Marks has been approved by the Dolphins Parties, Sponsor shall not depart therefrom or add any element thereto in any respect (e.g., inserting or replacing any element) without submitting such revision to, and obtaining the "final" written approval of the Dolphins Parties. Sponsor represents and warrants that all materials produced by Sponsor in connection with this Agreement shall comply, at Sponsor's sole expense, with all applicable laws, regulations, and government rules and standards. The Dolphins Parties' approval of any Sponsor or third-party materials are conditioned upon Sponsor's compliance with all applicable laws, regulations, and government rules and standards. The Dolphins Parties' approval shall not imply a representation or belief that the Dolphins Parties believe that applicable laws, regulations, or government rules or standards have been complied with.

3. **PROMOTIONS, SAMPLING & RETAILERS.** Except as expressly set forth herein or otherwise approved by the Dolphins Parties in writing, the Benefits may not be used for any sweepstakes, contest, or similar promotion. To the extent any such promotion is permitted, Sponsor shall be solely responsible for all aspects of such promotion, which shall in each case be subject to the Dolphins Parties' prior written approval. Without limiting the foregoing, Sponsor shall be positioned as the official sponsor of the promotion, Sponsor shall be solely responsible for compliance with any applicable laws or regulations, for registering the promotion with any applicable government bodies, for the delivery of any required tax forms or other documents, for securing affidavits and releases in favor of the Dolphins Parties (in a form approved by the Dolphins Parties) from any promotion winner, and for drafting promotion rules, which shall also be subject to the Dolphins Parties' prior written approval. Unless explicitly stated otherwise in the Agreement, consumable product sampling, sale, or other distribution is prohibited at the Stadium. To the extent any Benefits include consumable product rights at the Stadium, such Benefits shall be subject to Sponsor entering into a commercially reasonable written agreement with Stadium LLC's independent concessionaire consistent with similar agreements entered into with other product suppliers regarding commercially reasonable pricing, quantities, selection, distribution and other customary terms related to similar products. Unless explicitly stated otherwise in the Agreement, no Benefits may be used to identify third-party retailers or distribution channels of Sponsor products or services (collectively, "Retailers"). To the extent any Benefits include any rights relating to Retailers, such Benefits (i) shall not imply an endorsement or sponsorship relationship between such Retailer and the Dolphins Parties and/or the NFL, and (ii) shall be subject to the prior written approval of the Dolphins Parties in each instance.

4. **NON-EXCLUSIVITY.** Except as otherwise expressly provided herein, Sponsor's rights to receive the Benefits are non-exclusive and the Dolphins Parties shall be free to grant similar and/or identical rights to any third party. This Agreement and the rights and licenses granted to Sponsor in this Agreement shall not (and shall not be deemed to) restrict the Dolphins Parties in any way from exercising any rights or granting any licenses to other persons, entities, groups, or individuals to use any Team or Stadium Marks in connection with any products and/or services, which rights are expressly reserved to the Dolphins Parties. To the extent any Benefits granted to Sponsor are described as providing category protection or exclusivity in this Agreement, such category protection and/or exclusivity shall not extend to (a) the Miami Dolphins Cheerleaders (including, without limitation, the Miami Dolphins Cheerleaders Marks); (b) any parking areas located outside of the Stadium; (c) any media elements or assets (e.g., print, radio, internet, television), (d) any charitable or non-profit programs or initiatives (e.g., Miami Dolphins Foundation, Dolphins Challenge Cancer, Miami Dolphins Special Teams program) or minority/woman-owned or other diverse businesses, (e) activation of rights by League Sponsors, as

described in Section 5.c. below, or (f) non-Miami Dolphins events at the Stadium, including, without limitation, concerts, college football, soccer, festivals, corporate functions and other events. With respect to such non-Miami Dolphins events, Dolphins Parties shall use commercially reasonable efforts to provide applicable Benefits on a non-exclusive basis; provided, however, Sponsor acknowledges and agrees that certain "clean venue" or "restricted venue" events, including, but not limited to, Super Bowls, Olympics, motorsports races, Miami Opens or other tennis events, Wrestlemanias, and other championship events, may require the covering, removal or other modification of certain Sponsor Benefits, in which event Sponsor shall not be entitled to substitute benefits or other remedies as otherwise provided in Section 8 for unavailable Benefits. In the event a Sponsor with category protection or exclusivity no longer offers for sale, or materially reduces their offering of, products and/or services in any such protected or exclusive category during the Term, any category protection or exclusivity shall automatically extinguish with respect to such category.

5. **STADIUM POLICY; GOVERNING LEAGUE POLICIES.**

   a. **Dolphins Parties Policies**. Sponsor and the Dolphins Parties agree that this Agreement, including with respect to any Benefits, shall be performed in accordance with rules and policies of the Stadium and Team practice facility (the "Practice Facility"), including, without limitation, policies that may be implemented from time-to-time in connection with (a) certain "clean venue" events, and/or (b) signage illumination, as each of the foregoing may be applicable to this Agreement, if any. The Dolphins Parties shall have the right upon notice to Sponsor, at Dolphins Parties sole cost and expense, to require Sponsor to replace, relocate, and/or modify the design of Benefits to comport with Dolphins Parties' look-and-feel elements associated with such Benefits. In addition, to the extent Sponsor is receiving any signage Benefits at the Stadium, whether digital or static, such signage must comply with the then-current version of the NFL Stadium Signage Policy.

   b. **Governing League Policies**. The parties agree that this Agreement shall automatically be subject to any existing, new, or amended NFL rules or regulations applicable to advertising or promotional benefits provided by NFL member teams and their affiliates to sponsors effective as of the date such regulation shall take effect, and that this Agreement shall incorporate and be subject to the Constitution, By-Laws, rules and regulations, the duly authorized resolutions of the governing body, the decrees and rulings of the commissioner or any designee, the terms and conditions of any and all agreements to which the NFL is a party and as to which the NFL has bound its member clubs, any interpretations, rulings or other directives relating to any of the foregoing, and any policies, guidelines, specifications, or other requirements imposed in connection with the hosting of any Super Bowl or Pro Bowl Game at the Stadium (collectively, the "Governing League Policies"). It is understood that Governing League Policies may, from time-to-time, require the Team to play preseason and/or regular season Team home games at venues other than the Stadium and that the Dolphins Parties shall not be obligated to provide substitute Benefits in such instances.

   c. **League Sponsors**. The Benefits provided by the Dolphins Parties to Sponsor hereunder are subject to termination in whole or in part at any time upon written notice to Sponsor if such Benefits conflict with or are deemed by the NFL to conflict with any exclusive advertising rights granted by NFL Enterprises, L.P., NFL Productions LLC, NFL Properties, LLC, NFL Films, Inc. or any affiliate of any of the foregoing (collectively "NFL Entity") to one of its advertisers or sponsors. In the event of any such termination of Benefits, the non-terminated Benefits provided to Sponsor by the Dolphins Parties shall nonetheless continue for the remainder of the Term and the provisions of Section 8.b. shall apply. Notwithstanding any other provision to the contrary, Sponsor agrees that the Dolphins Parties may be required to allow or authorize a League Sponsor (as defined below) to engage in advertising and promotional activities in the Stadium, or otherwise provide benefits to such League Sponsor, if such League Sponsor is entitled to engage in such activities or receive such benefits pursuant to any sponsorship or promotional licensing arrangement now or hereafter entered into between such League Sponsor and the NFL Entity. For purposes of this Agreement, the term "League Sponsor" shall mean any person or entity which currently is, or at any time becomes, a sponsor or promotional licensee of or with respect to any NFL event or program now or hereafter in existence. By way of illustration only and without limiting the generality of the foregoing, League Sponsors may place advertising and promotional materials (including displays) in the Stadium, in connection with a NFL event, such as the Super Bowl, and League Sponsors may have the rights to use the Marks of all NFL member clubs on a collective basis.

   d. **Required Termination/Modification**. If any rule or regulation as described above requires the termination or modification of any of the Benefits, such Benefit shall be modified or terminated upon written notice to Sponsor and the provisions of Section 8.b. shall apply to any such termination or modification.

6. **REPRESENTATIONS AND WARRANTIES.**

   a. Each party hereby represents to each other party the following, all of which representations and warranties shall apply during the Term:

   i. Such party is in good standing and duly authorized to transact business in the State of Florida, with full power and authority to enter into and fully perform its obligations under this Agreement. The execution and delivery of this Agreement on behalf of such party has been duly authorized by such party and this Agreement constitutes the valid, binding and enforceable obligation of such party.

   ii. Neither this Agreement nor anything required to be done hereunder by such party (A) violates or shall violate any corporate charter, contract or other document to which such party is a party or by which it is otherwise bound, or (B) violates, infringes or shall violate or infringe any right of any person or entity.

   iii. Such party will perform all obligations and exercise all rights yielded to it hereunder (A) in a professional and diligent manner that will avoid any conflicts of interest in the performance of its obligations hereunder and (B) in accordance with all applicable laws, rules and regulations, including, by way of example, those prohibiting the employment of persons not eligible to be lawfully employed.

   iv. Such party has not taken and will not take any action that interferes in any manner with the other party's rights under this Agreement or that is otherwise inconsistent with the terms of this Agreement.

7. **INDEMNIFICATION & INSURANCE.**

   a. **Indemnification by Sponsor**. Sponsor shall defend, indemnify, and hold harmless the Dolphins Parties and any entity owned or controlled by, or under common ownership or control with, or which owns or controls, any of the Dolphins Parties (collectively, "Dolphins Parties Affiliated Entities"), and their respective members, partners, shareholders, officers, directors, employees, agents and representatives (collectively, the "Dolphins Parties Indemnitees") from and against any and all claims, suits, orders, damages, liabilities, costs and expenses, including reasonable attorney's fees (collectively, "Claims"), arising from, relating to, or in connection with: (i) any personal injury (including illness, disability, or death) or property damage or loss sustained by any individual attending or participating in the Fan Cruise, whether such personal injury or property damage or loss occurs on the ship or at a port-of-call and regardless of whether such individual purchased a stateroom from Sponsor for the Fan Cruise, (ii) the Fan Cruise or any other product or service of Sponsor that is advertised or promoted using any Team or Stadium Marks, (iii) any act or omission of Sponsor or its agents, (iv) Sponsor's breach or alleged breach of the terms of this Agreement, including, without limitation any obligation, representation, warranty, or covenant in this Agreement, (iv) any Claim arising out of, resulting from, or relating to any commercial, advertisement, sign, advertising copy, Marks, content, or other promotional material furnished by or on behalf of Sponsor in connection with the Benefits provided hereunder, or (v) Sponsor's receipt, activation, and use of the Benefits. Notwithstanding the foregoing, Sponsor shall not have any indemnification obligations with respect to any Claim arising directly from the gross negligence or willful misconduct of the Dolphins Parties or their agents.

   b. **Indemnification by the Dolphins Parties.** The Dolphins Parties shall defend, indemnify, and hold harmless Sponsor and any entity owned or controlled by, or under common ownership or control with, or which owns or controls Sponsor (collectively, "Sponsor Affiliated Entities"), and their respective members, partners, shareholders, officers, directors, employees, agents and representatives (collectively, the "Sponsor Indemnitees") from and against any and all Claims arising from, relating to, or in connection with: (i) a claim that Sponsor's use of any Team or Stadium Marks, as approved for use by the Dolphins Parties in accordance with this Agreement, violates or infringes upon the trademark, copyright or other intellectual property right of a third party in or to the Team or Stadium Marks, or (ii) the Dolphins Parties' breach of this Agreement. Notwithstanding the foregoing, the Dolphins Parties shall not have any indemnification obligations with respect to any claim arising directly from the gross negligence or willful misconduct of Sponsor or its agents.

   c. **Indemnity Procedures.** Each party shall promptly notify the other party of any Claim to which the indemnity obligations set forth in this Section 7 applies, and the indemnifying party agrees to defend all Claims and to conduct the defense thereof at its expense and by qualified counsel, which counsel shall be reasonably satisfactory to the other party. In connection with any Claim to which the foregoing indemnities pertain, the indemnifying party shall keep the indemnified party fully advised of all material developments and shall not enter into a settlement without the indemnified party's prior written approval, which shall not be unreasonably withheld. In addition, the indemnified party shall cooperate with the indemnifying

party in connection with any such defense. These indemnity obligations shall survive the termination or expiration of this Agreement.

    d. **Insurance**.

    i. The Dolphins Parties shall, at their own expense, maintain in effect throughout the Term, commercial general liability insurance policies with carriers of recognized standing, with limits of liability of at least Two Million Dollars ($2,000,000), governing any and all property damage and personal injury (including death) arising out of activities covered by this Agreement.

    ii. Sponsor shall, at its own expense, maintain in effect throughout the Term (A) commercial general liability insurance policies with carriers of recognized standing which are reasonably acceptable to the Dolphins Parties with limits of liability of at least Two Million Dollars ($2,000,000), covering any and all property damage and personal injury (including death) arising out of the Fan Cruise and any activities covered by this Agreement and providing for blanket contractual liability coverage applicable to the terms and conditions of this Agreement; (B) commercial umbrella liability insurance ("Umbrella") with limits of not less than Five Million Dollars ($5,000,000) for each occurrence and in the aggregate; and (C) errors and omissions/media liability coverage of at least One Million Dollars ($1,000,000). All such policies shall name MDL, Stadium LLC, South Florida Football Associates LLC, Fin Associates, LLC, South Florida Sports Foundation, Inc., and Dolphins Cycling Challenge, Inc. d/b/a Dolphins Challenge Cancer as additional insureds thereunder and shall be endorsed to provide MDL and Stadium LLC with at least thirty (30) days advance written notice of any cancellation and/or restriction. Sponsor shall provide certificates of insurance evidencing such coverage upon request from the Dolphins Parties.

    e. **Limitation of Liability.** IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE FOR CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES, INCLUDING BUT NOT LIMITED TO ANY DAMAGES RESULTING FROM LOSS OF USE OR PROFITS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER IN AN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE) OR ANY OTHER LEGAL THEORY, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8. **DEFAULT; MODIFICATION; TERMINATION**.

    a. **Default**.

    i. Without prejudice to any other rights, the Dolphins Parties shall have the right to terminate this Agreement upon written notice to Sponsor if: (a) Sponsor fails to perform or comply with any material term or condition of this Agreement (including, without limitation, any representation or warranty contained herein) within five (5) calendar days following delivery of written notice to Sponsor stating such failure or failures; provided that any such failure remains uncured at the end of such period; and further provided that the Dolphins Parties may terminate immediately upon written notice if such failure to perform or comply is not reasonably capable of being cured, as determined by the Dolphins Parties; (b) Sponsor breaches any other agreement related to the provision of goods or services at the Stadium; (c) Sponsor commences a voluntary case under title 11 of the United States Code or the corresponding provisions of any successor law; or an involuntary petition for Sponsor is filed under title 11 of the United States Code or the corresponding provisions of any successor laws; (d) a court of competent jurisdiction appoints, or the Sponsor makes an assignment of all or substantially all of its assets to, a receiver or custodian for Sponsor; or (e) Sponsor generally fails to pay its debts as they become due (unless those debts are subject to a good-faith dispute as to liability or amount) or acknowledges in writing that it is unable to do so. Sponsor acknowledges and agrees that a breach by Sponsor of any other agreement entered into by Sponsor (or its affiliates) and the Dolphins Parties (or their affiliates), shall constitute an incurable default under this Agreement and entitle the Dolphins Parties to exercise each and every right and remedy available to it, including, without limitation, termination.

    ii. The obligation of Sponsor to pay the Fee and any other amounts due under this Agreement is independent of any other agreement that may have been entered into between Sponsor (or its affiliates) and the Dolphins Parties, their affiliates, its concessionaires or any other party. Sponsor will promptly make all such payments due hereunder to the Dolphins Parties, without any deductions, set offs, or counterclaims against such payments on account of any actual or alleged breach or default by, or claims against, the Dolphins Parties, Miami Dolphins, Ltd., South Florida Stadium LLC, or any other person or entity. The Dolphins Parties shall have the right, at their sole discretion, to apply any and all payments made by Sponsor, regardless of how designated, to past due fees, expenses, taxes, or other charges owing under this Agreement, or any other agreement entered into by and between Sponsor (or its affiliates) and any of the Dolphins Parties (or their

affiliates), before applying any remaining balance to current amounts due under this Agreement.

    iii. Subject to the Dolphins Parties' rights to reduce, eliminate or substitute certain Benefits pursuant to Sections 5.c. and 8.b. hereof, Sponsor shall have the right to terminate this Agreement upon written notice to the Dolphins Parties if the Dolphins Parties fail to perform or comply with any material term or condition of this Agreement within ten (10) business days following delivery of written notice to the Dolphins Parties stating such failure or failures; provided that any such failure remains uncured at the end of such period.

    b. **Modification, Substitution or Elimination of Benefits**.

    i. The Dolphins Parties may modify, reduce, eliminate, or otherwise fail to deliver any Benefit(s) from time to time for any reason including, but not limited to, (a) those policies described in Section 5 hereof and/or (b) the occurrence of any Force Majeure Event (as defined below) in Section 9.a. Upon any such modification or non-delivery of Benefits, the Dolphins Parties will, within ninety (90) days of receipt of written notice from Sponsor regarding any such non-delivery (or such longer period as circumstances may reasonably require), in good faith provide Sponsor with a substitute Benefit of substantially equivalent promotional value for any Benefit that the Dolphins Parties did not provide (which such Benefit may be provided during a subsequent Contract Year or for alternative events), provided, however, that in the event that such modification or non-delivery of Benefits is the result of a strike, lockout, or other labor dispute or work stoppage (each, a "Work Stoppage"), then the provisions of Section 9.b. shall exclusively govern such non-delivery and/or modification of Benefits.

    ii. If any of the Dolphins Parties enters into a Stadium naming rights sponsorship or a Stadium corner sponsorship, each of the Dolphins Parties shall have the option, at its sole discretion, upon thirty (30) days written notice to Sponsor, to either: (A) terminate this Agreement; or (B) in exchange for a ten percent (10%) reduction of the Fee, convert any category protected rights in this Agreement to non-exclusive rights, in which case such Fee reduction shall become effective as of the effective date of the applicable naming rights or corner sponsorship agreement. In the event of termination pursuant to the preceding sentence, as Sponsor's sole remedy, the Dolphins Parties shall refund Sponsor a pro rata portion of any Fees paid by Sponsor for Benefits not provided by the Dolphins Parties and received by Sponsor as of the date of such termination.

    iii. Any decision by the Dolphins Parties to broadcast Team-affiliated content through a different medium or media outlet during the Term, including, without limitation, new television, radio, or internet partners, shall not constitute a breach of this Agreement and shall not require the Dolphins Parties to provide any substitute Benefits under this Section 8.b, provided, however, that the content and affiliated Benefits are broadcast in the quantities set forth in the Agreement. Except as otherwise expressly set forth herein, the content, timing, platform, and number of any digital Benefits provided by the Dolphins Parties (i.e., social media content, website recognition, etc.) shall be determined by the Dolphins Parties in their sole good faith discretion.

    c. **Reversion of Rights; Payment**. Upon termination of this Agreement for any reason set forth in this Agreement, all rights and privileges granted to Sponsor hereunder shall automatically revert to the Dolphins Parties, and Sponsor shall have no further right to use the Dolphins Parties' Marks. Upon termination of this Agreement by the Dolphins Parties pursuant to Section 8.a.i., no portion of any prior payments made to the Dolphins Parties shall be refundable and Sponsor shall pay all amounts due under this Agreement within thirty (30) days after receipt of notice of termination. The expiration or termination of this Agreement shall not relieve the parties of any obligations required to be performed up to the effective date of the expiration or termination or from those obligations that survive expiration or termination.

    d. **Cross-Termination**. Upon termination of this Agreement by the Dolphins Parties pursuant to Section 8.a.i., above, in addition to any other remedies available to the Dolphins Parties at law or in equity, the Dolphins Parties (or any affiliate thereof) also shall have the right (but not the obligation) to terminate any other existing agreement between such Dolphins Party (or any affiliate thereof) and Sponsor (or any affiliate of Sponsor).

    e. **Annual Recaps; Limitations Period**. The parties acknowledge and agree that they intend, but are not obligated, to meet and confer in good faith at least once each Contract Year in order to recap and review the Benefits provided to Sponsor during the immediately preceding Contract Year and ensure compliance with the terms and conditions of this Agreement. To the extent Sponsor contends that any Benefits in a given Contract Year were undelivered, unavailable, or delivered in a manner inconsistent with this Agreement, Sponsor shall provide written notice to the Dolphins Parties specifying such non-compliance in reasonable detail, which notice

shall be delivered to the Dolphins Parties no later than sixty (60) days following the conclusion of the Contract Year in which such Benefits were to be provided. Failure to timely provide such notice in accordance with this section shall constitute a waiver of any rights and remedies (e.g., substitute Benefits) that may have been available to Sponsor with respect to the Benefits that were allegedly undelivered, unavailable, or delivered in a manner inconsistent with this Agreement.

9. **FORCE MAJEURE.**

   a. No party shall be liable for failure or other delay in performance of its obligations (other than payment obligations) under this Agreement and such failure or delay shall not constitute a breach under this Agreement to the extent such failure or delay is due to circumstances beyond its reasonable control, including acts of God (fires, floods, storms, hurricanes, earthquakes, tornadoes, etc.), acts of public enemy, terrorism, war, riot, pandemics, rebellion, civil disturbance, sabotage, accidents, insurrections, blockades, embargoes, acts of any governmental or quasi-governmental authority, or a Work Stoppage (collectively, "Force Majeure Events" and individually, a "Force Majeure Event"). In the event a Force Majeure Event causes the unavailability of any Benefits during the Term, the provisions of 8.b. will apply.

   b. Notwithstanding Section 9.a. above, if a Force Majeure Event is a result of a Work Stoppage, then (i) Sponsor shall be entitled to substitute Benefits in accordance with Section 8.b., but only if such Work Stoppage causes the cancellation, without rescheduling, of one (1) or more Team regular season home games and results in non-delivery of Sponsor Benefits; and (ii) if such Work Stoppage causes the cancellation, without rescheduling, of six (6) or more Team regular season home games and results in non-delivery of Sponsor Benefits, then the Dolphins Parties shall have the option, as Sponsor's exclusive remedy, of either: (A) extending the Term at no additional cost to Sponsor for a reasonable time period (but not to exceed an extension of one (1) calendar year) for the Dolphins Parties to provide Sponsor the Benefits without further liability; or (B) providing substitute Benefits pursuant to Section 8.b. In the event of an extension, if the Dolphins Parties are unable to provide Sponsor the full level of Benefits by the conclusion of any such extension period, then, unless otherwise agreed by the parties hereto in writing, the Dolphins Parties shall have the right to terminate this Agreement and provide Sponsor a refund of monies paid in advance for Benefits not received by Sponsor and each party hereto shall be relieved of any further obligation to the other party with respect to this Agreement.

10. **PLAYERS AND COACHES.** Sponsor acknowledges that, unless otherwise stated herein, this Agreement does not grant it any rights with respect to the name, image, likeness, signature or other attributes of any player, coach, or other employee of the Team. Sponsor shall be responsible for securing whatever rights may be required for the use of such names, images, likenesses, signatures, or other attributes and may only do so with the prior written approval of the Team. Sponsor represents that it will not exercise the rights granted in this Agreement in any manner that will imply that Sponsor has obtained any such rights without separate written authorization from the appropriate player, coach, or employee.

11. **PUBLIC ANNOUNCEMENTS & CONFIDENTIALITY.** Sponsor shall not issue or produce any public announcements, press releases, or other promotional materials relating in any way to this Agreement or the relationship of the parties without the prior written consent of the Dolphins Parties in each instance. The parties agree to maintain in confidence the terms and conditions of this Agreement, except to the extent that a proposed disclosure by a party of any specifications or conditions hereof is authorized in advance by the Dolphins Parties or is required by law.

12. **NO JOINT VENTURE.** It is mutually understood and agreed that Sponsor, on the one hand, and the Dolphins Parties, on the other, and their respective officers, directors, employees, representatives, and agents are, at all times, herein, acting and performing separately and independently of each other and are in no way or manner to represent themselves as agents or employees of the other party. As such, no party shall incur any expenses (except with respect to expenses incurred on Sponsor's behalf in connection with the production, installation, and/or activation of the Benefits) or create any liens or encumbrances in another party's name or against another party's interests. This Agreement shall not create a joint venture, partnership, or a relationship of principal and agent, or of employer and employee, between the parties hereto.

13. **NOTICES.** All formal notices required to be given hereunder, including, without limitation, notice of termination, notice of claim, and similar one-time notices of similar importance (but not including routine day-to-day communications between the parties in the course of performing their obligations under this Agreement, which may be delivered by e-mail), shall be properly served in writing and delivered either by (i) personal delivery, (ii) certified or registered mail, postage prepaid, facsimile, or (iii) by recognized overnight courier service which delivers only upon the signed receipt of the addressee, which in any case shall be delivered to the following addresses if to Sponsor, to the contact person for Sponsor set forth on the first page of this Agreement at the address set forth therein; and if to the Dolphins Parties, to Miami Dolphins, Ltd., 347 Don Shula Drive, Miami Gardens, Florida 33056, Attn: CEO, with copy via electronic mail (not to constitute legal notice) to legalnotices@dolphins.com. Notice shall be deemed delivered on the date of delivery.

14. **GOVERNING LAW AND JURISDICTION.** This Agreement and any dispute arising from, relating to, or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without reference to its conflict of laws principles. Jurisdiction and venue for any legal proceedings arising from, relating to, or in connection with this Agreement shall exclusively lie in the state and federal courts situated in Miami-Dade County, Florida and each party waives any objection based on venue or forum non conveniens with respect to any proceedings instituted in such courts.

15. **SUCCESSORS AND ASSIGNS.** The Dolphins Parties may each assign their rights or obligations under this Agreement, without consent. Sponsor may not assign, sublicense, or encumber this Agreement, or any of the Benefits set forth herein, directly or indirectly, by law or by contract, without the Dolphins Parties' prior written approval, which approval may be withheld in the Dolphins Parties' sole discretion. Any transfer of a controlling interest in Sponsor shall be deemed an assignment governed by the preceding sentence.

16. **DISPUTE EXPENSES.** In connection with any action arising from, relating to, or in connection with this Agreement, the prevailing party shall be entitled to an award of its expenses, including reasonable attorney's fees and disbursements, incurred or paid before and at trial or any other proceeding which may be instituted, at any tribunal level, and whether or not suit or any other proceeding is instituted.

17. **ENTIRE AGREEMENT.** This Agreement, including all exhibits or schedules hereto, sets forth the entire understanding and agreement of the parties hereto with respect to its subject matter and supersedes all prior understandings or agreements among the parties hereto relating to the same subject matter. Any amendments or modifications to this Agreement must be in writing, mutually agreed upon and signed by all parties hereto in order to be effective.

18. **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (INCLUDING BUT NOT LIMITED TO ANY CLAIMS, COUNTERCLAIMS, CROSS-CLAIMS, OR THIRD-PARTY CLAIMS) ARISING FROM, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN. FURTHER, EACH OF THE PARTIES HERETO CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF EITHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.**

19. **COMPLIANCE WITH LAWS.** By entering into this Agreement, the parties hereto specifically intend to comply with all applicable laws, rules and regulations as they may be amended from time to time. In the event that any part of this Agreement is determined to violate applicable federal, state or local laws, rules or regulations, the parties agree to negotiate in good faith revisions to the provision or provisions that are in violation.

20. **TAXES & FEES.** All payments due to the Dolphins Parties under this Agreement shall be net of (i) all applicable fees and commissions of any agency or other third party and (ii) all applicable taxes (other than income taxes), all of which shall be the responsibility of the party making the payment. If a Dolphins Party is obligated to collect any such taxes with respect to such payments or the value of any other Benefit, Sponsor shall increase the amounts of its payments to such Dolphins Party by the amount of such tax. The Dolphins Parties hereby confirm to Sponsor that, to the best of their knowledge, as of the Effective Date, none of the Dolphins Parties is obligated to collect any such taxes from Sponsor. Unless specifically agreed to in writing by the Dolphins Parties and subject to such additional costs that the Dolphins Parties may charge, in their discretion, the Dolphins Parties shall not be required to bill Sponsor using Sponsor's or any third-party billing portal or program. In no event shall the Dolphins Parties' use of Sponsor's or any third-party billing portal or program, or any terms thereof, operate to amend or supplement the terms and conditions of this Agreement, which will remain binding in accordance with its terms.

21. **SEVERABILITY.** If for any reason, any provision or provisions contained in this Agreement are held to be invalid, illegal or otherwise void, remaining provisions of this Agreement shall not be affected and shall continue in full force and effect.

22. **REPRESENTATION BY COUNSEL.** Each of Sponsor and the Dolphins Parties is represented in this transaction by separate counsel. The parties hereto have

participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by Sponsor and the Dolphins Parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

23. **SECTION HEADINGS.** The section headings contained in this Agreement are inserted for convenience of reference and in no way define, describe, or limit the scope or intent of this Agreement or any provision hereof.

24. **INCORPORATION OF EXHIBITS.** All exhibits (including these Terms and Conditions) and, if applicable, schedules to this Agreement and referred to herein are incorporated into this Agreement as though fully set forth herein.

25. **COUNTERPARTS.** This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one and the same instrument.

26. **ELECTRONIC SIGNATURE.** This Agreement may be executed by electronically-delivered signature (e.g., PDF format copy of the agreement with signatures) which shall, for all purposes, serve as an original executed counterpart of this Agreement upon delivery of an executed copy hereof by electronic transmission.

27. **EXECUTION.** The signatories to this Agreement warrant that they have full and binding authority to make the commitments contained herein on which shall, for all purposes, serve as an original executed counterpart of this Agreement upon delivery of an executed copy hereof by electronic transmission.