UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 23-cv-21514-BLOOM/Otazo-Reyes**

MIAMI DOLPHINS, LTD. and
SOUTH FLORIDA STADIUM LLC,

    Plaintiffs,

v.

FIRST CLASS CRUISES, LLC and
JEFFREY NAHOM,

    Defendants.
_____/

**ORDER ON MOTION FOR DEFAULT FINAL JUDGMENT**

**THIS CAUSE** is before the Court upon Plaintiffs Miami Dolphins, Ltd.'s and South Florida Stadium LLC's ("Plaintiffs") Motion for Default Final Judgment, ECF No. [17] ("Motion"), filed on June 26, 2023. Defendant Jeffrey Nahom ("Nahom") failed to appear, answer, or otherwise plead to the Complaint, ECF No. [1], despite having been served, so the clerk entered default against him on May 24, 2023. ECF No. [12]. Defendant First Class Cruises, LLC ("FCC") also failed to appear, so the Clerk entered default against it on June 2, 2023. ECF No. [14]. The Court has carefully considered the Motion, the record in this case, the applicable law, and is otherwise fully advised. For the following reasons, Plaintiffs' Motion is granted.

**I.     BACKGROUND**

Plaintiffs brought this case on April 21, 2023, under this Court's diversity jurisdiction, asserting four claims under Florida state law: (1) breach of contract against FCC; (2) promissory estoppel against FCC and Nahom; (3) unjust enrichment against FCC; and (4) fraudulent misrepresentation against FCC and Nahom. *See* Complaint, ECF No. [1]. Plaintiffs also attached to the Complaint four exhibits: (1) a Sponsorship Agreement, effective June 1, 2022 (the

"Agreement"), *see* ECF No. [1-4]; (2) the First Amendment to Sponsorship Agreement, effective January 20, 2023 (the "Amendment"), *see* ECF No. [1-5]; (3) a Notice of Default, dated April 10, 2023, *see* ECF No. [1-6]; and (4) a Notice of Termination, dated April 18, 2023, *see* ECF No. [1-7].

Plaintiffs seek damages in connection with FCC's efforts to organize and operate a cruise marketed as a "Miami Dolphins Fan Cruise" (the "Fan Cruise"). In June 2022, Plaintiffs entered into the Agreement with Defendant FCC in connection with the Fan Cruise. *See* ECF No. [1] ¶¶ 2, 20; ECF No. [1-4]. Under the terms of the Agreement, Plaintiffs agreed to provide various benefits in support of the Fan Cruise and arrange for former or current Miami Dolphins players to participate in the Fan Cruise. *See* ECF No. [1] ¶ 24; ECF No. [1-4] at 1–6. In exchange, FCC agreed to make a Cash Payment of $525,000 for the 2022 Contract Year to Plaintiffs and also pay Plaintiffs an Appearance Fee Budget of $300,000. *See* ECF No. [1] ¶¶ 24–25; ECF No. [1-4]. FCC further agreed to provide each current or former Miami Dolphins player with a complimentary stateroom for the Fan Cruise. *See* ECF No. [1] ¶ 26; ECF No. [1-4] at 7–8. The Agreement also incorporated other terms and conditions, including but not limited to, a provision governing late payment remedies, a provision entitling the prevailing party to an award of expenses and reasonable attorney's fees, a choice-of-law provision identifying the parties' intent that any dispute be determined under Florida law, and a forum-selection clause that jurisdiction and venue "shall exclusively lie in the state and federal courts situated in Miami-Dade County, Florida." *See* ECF No. [1] ¶ 27; ECF No. [1-4] at A-1–A-5.

After the Miami Dolphins, Ltd. issued a press release on July 21, 2022, FCC began selling the Fan Cruise to the general public. *See* ECF No. [1] ¶¶ 28–29. Between July 21, 2022 and February 4, 2023, FCC purportedly sold 259 staterooms for the Fan Cruise. *Id.* ¶ 30. FCC

represented that the Fan Cruise included, among other things, "room gratuities and main dining room gratuities" and "MSC's[1] Easy Plus beverage package." *Id.* ¶ 31. FCC also represented that "Wi-fi is free for everyone in the Miami Dolphins Fan Cruise group."

In November 2022, the parties amended the Agreement and. in exchange for FCC agreeing to pay an additional incremental Cash Payment of $30,000.00, Plaintiffs would provide several additional benefits. *Id.* ¶ 34.

Despite agreeing to pay the 2022 Cash Payment in three separate installments of $175,000.00 each, all of which were to be paid before December 1, 2022, *see id.* ¶ 24; ECF No. [1-4] at 7, FCC made one payment of $175,000.00 on August 26, 2022. *See* ECF No. [1] ¶ 32. On December 28, 2022, less than a week after the parties discussed FCC's failure to pay the second and third installments of the 2022 Cash Payment, Nahom emailed Plaintiffs acknowledging that FCC owed Plaintiffs more than $650,000.00 for the 2022 Contract Year and proposed a revised payment schedule. *See id.* ¶¶ 35–36. On January 6, 2023, FCC made a partial second payment of $100,000.00. *See id.* ¶ 38.

In mid-January 2023, before agreeing to amend the Agreement, Plaintiffs requested assurances that FCC would be able to perform its remaining contractual obligations. *See id.* ¶ 40. Nahom assured Plaintiffs that FCC had no intention of canceling the Fan Cruise. *See id.* ¶ 41. Nahom also represented that "[a]ll booked guests are paid for and therefore the cruise line cannot cancel us," and that "[a]ll venues, meals and alcohol are included in our cruise contract and there is nothing additional that needs to be paid to the cruise line to run our events." *See id.* ¶ 41. In reliance on the representations made by FCC and Nahom personally, Plaintiffs agreed to amend the Agreement. *See id.* ¶ 43; ECF No. [1-5]. The Amendment memorialized the parties' November

---

[1] MSC Cruises, S.A.

3

2022 oral agreement and incorporated a revised payment schedule. *See* ECF No. [1] ¶¶ 44–47; ECF No. [1-5].

In mid-February 2023, FCC failed to pay Plaintiffs in accordance with the Amendment. *See* ECF No. [1] ¶ 48. FCC, however, again assured Plaintiffs that "many of the large costs have been paid already, including the cruise line" and that there were no other liabilities that it could not "pay that will impact the quality of the cruise or FCC's ability to pay the Dolphins what is owed over time." *See id.* ¶¶ 49–50.

Less than a month before the Fan Cruise's scheduled departure date, Nahom informed Plaintiffs that, despite his previous representations, FCC had not secured all of the staterooms necessary for the Fan Cruise. *See id.* ¶ 52. Contrary to the previous misrepresentations made by both FCC and Nahom, FCC had not secured 61 staterooms for which Miami Dolphins fans already had paid FCC, nor had FCC secured staterooms for any of the former Miami Dolphins players who were central to the Fan Cruise. *Id.* ¶¶ 53–54.

Instead, Nahom emailed Plaintiffs at around 2 p.m. on March 6, 2023, informing Plaintiffs that "MSC is holding cabins [sic] needed but will release them soon" and Nahom "need[ed] to get back to MSC [that] afternoon." *See id.* ¶ 55. Nahom told Plaintiffs that they "must act now to salvage everything," because "the alternative is much worse for everyone." *See id.* ¶ 55. Nahom promised that if Plaintiffs paid the cruise operator, MSC, to secure the necessary staterooms, "every penny will get paid back." *See id.* ¶ 55. Nahom followed up this correspondence by stating, "I take full responsibility for the situation I've put the Dolphins organization in" and will "pay the Dolphins back every penny." *See id.* ¶ 57. FCC's counsel also separately assured Plaintiffs that "if the final rooms are secured," FCC "will be able to pay that money back to the Dolphins." *See id.* ¶ 56. In reliance on the promises and assurances made by both FCC and Nahom personally,

Plaintiffs paid MSC the outstanding balance of $251,371.62 to avoid a last-minute cancellation and ensure that Miami Dolphins fans and players would have accommodations aboard the Fan Cruise. *See id.* ¶ 58.

The Fan Cruise left the Port of Miami on April 2, 2023. *See id.* ¶ 59. During the Fan Cruise, Plaintiffs discovered that FCC had not paid MSC for amenities that were supposed to be included in fans' bookings. *See id.* ¶ 63. Nahom acknowledged that FCC was responsible for, and would pay MSC, the additional $17,738.91 that was due. *See id.* ¶ 63. Nahom, however, repeatedly failed to make the necessary payments. *Id*. Instead, Plaintiffs paid MSC to ensure that Miami Dolphins fans who had purchased and paid for such amenities through FCC were able to continue using those amenities during the cruise. *Id*. Plaintiffs also discovered that, instead of using the funds that FCC had collected to secure fan and player staterooms, or fulfill FCC's other contractual obligations to Plaintiffs, Nahom and his family, as well as other FCC personnel, were staying in MSC Yacht Club staterooms, the most expensive, luxurious accommodations on MSC's cruise ship. *See id.* ¶ 64.

Following the Fan Cruise, FCC did not pay any of the contractual amounts still outstanding, nor did FCC or Nahom make good on any of the promises to pay back Plaintiffs for the additional amounts that Plaintiffs had paid MSC to take care of FCC's and Nahom's obligations. *See id.* ¶ 67. Thus, on April 10, 2023, Plaintiffs sent FCC a Notice of Default, demanding the contractual payments due as well as reimbursement for the additional amounts paid to MSC. *Id*. ¶ 68–69. In response, Nahom acknowledged that his actions and FCC's actions caused Plaintiffs to be put at "financial [and] reputational risk," but failed to make any additional payments. *Id*. ¶¶ 70–71. Accordingly, on April 18, 2023, Plaintiffs terminated the Agreement. *Id*. ¶ 72.

After filing the Complaint on April 21, 2023, Plaintiffs served Defendants FCC and Jeffrey Nahom, individually, with copies of the summonses and Complaint. *See* ECF Nos. [9], [10]. Despite being properly served, Defendants failed to appear or respond. Thus, upon motions by Plaintiffs, the Clerk of Court entered default against Jeffrey Nahom and FCC on May 24, 2023, and June 2, 2023, respectively. *See* ECF Nos. [12], [14]. On June 26, 2023, Plaintiffs filed the present Motion for Default Final Judgment, ECF No. [17], in which they request that the Court enter default final judgment against Defendants and award damages accordingly.

## II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55(b), the Court is authorized to enter a final judgment of default against a party who has failed to plead in response to a complaint. This Circuit maintains a "strong policy of determining cases on their merits and we therefore view defaults with disfavor." *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003). Nonetheless, "[under Federal Rule of Civil Procedure 55(a), the entry of a default judgment is appropriate '[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise.'" *Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 910 (11th Cir. 2011).

All well-pleaded allegations of fact are deemed admitted upon entry of default. *Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[2] "The corollary of this rule, however, is that a defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered." *Id.* Moreover, "[a] court has an obligation to assure that there is a legitimate basis for any damage

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all the decisions of the former United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981.

6

award it enters[.]" *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). Stated differently, "a default judgment cannot stand on a complaint that fails to state a claim." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997). Therefore, before granting default judgment, "the district court must ensure that the well-pleaded allegations of the complaint . . . actually state a cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007).

### III. DISCUSSION

#### A. Plaintiffs' Breach of Contract Claim

"Under Florida law, '[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages.'" *ConSeal Int'l Inc. v. Neogen Corp.*, 2020 WL 4736203, at *8 (S.D. Fla. Aug. 14, 2020) (quoting *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999)).

Plaintiffs have stated a claim for breach of contract. Plaintiffs attached to the Complaint copies of the executed Agreement and executed Amendment. *See* ECF No. [1-4]; ECF No. [1-5]. The Amendment required that, in exchange for benefits provided by Plaintiffs, Defendant FCC was required to pay Plaintiffs a total of $855,000.00. *See* ECF No. [1] ¶¶ 24–25, 44–47, 75; ECF No. [1-5] at 2–3. Despite receiving the contractual benefits from Plaintiffs, Defendant FCC paid Plaintiffs only $275,000.00. *See* ECF No. [1] ¶¶ 32, 38. As a result of Defendant FCC's breach, Plaintiffs suffered damages of $580,000.00.

Accordingly, Plaintiffs are entitled to default final judgment against Defendant FCC on Plaintiffs' breach of contract claim.

Case No. 23-cv-21514-BLOOM/Otazo-Reyes

### B.     Default Final Judgment on Plaintiffs' Fraudulent Misrepresentation Claim

To state a claim for fraudulent misrepresentation under Florida law, a plaintiff must allege: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Godelia v. Doe 1*, 881 F.3d 1309, 1321 (11th Cir. 2018) (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)). A fraudulent misrepresentation claim "based on allegedly false statements that induced the defendant to continue with the contract and not exercise its contractual right" is "an independent tort separate and apart from a breach of contract" claim. *Prime Prop. & Cas. Ins. Co. v. Kepali Grp., Inc.*, No. 21-cv-81787, 2022 WL 18781039, at *3 (S.D. Fla. Oct. 28, 2022) (quotation marks omitted).

Plaintiffs have stated a claim for fraudulent misrepresentation. Defendants knowingly made false misrepresentations of material fact to Plaintiffs regarding the status of payments FCC had made to MSC. ECF No. [1] ¶¶ 41, 49, 100–02. Defendants made these statements even though they knew that MSC had not been paid for several staterooms nor had MSC been paid for amenities in connection with certain passengers' bookings. *Id*. ¶¶ 103–04. Plaintiffs relied on these misrepresentations and not only continued with the contract, but also entered into the Amendment to provide Defendant FCC with additional benefits. *Id*. ¶¶ 105. As a result, Plaintiffs suffered additional damages in the amounts of $251,371.62 for room bookings, *id.* ¶ 58, and $17,738.91 for amenities on the cruise. *Id*. ¶ 63, for a total of **$269,110.53**.

Moreover, given that the misrepresentations were made by both Defendants FCC and Jeffrey Nahom, individually, Defendants are jointly and severally liable for the damages resulting from these fraudulent misrepresentations. *Marteen v. Rutti Auto Broker, LLC*, No. 19-cv-61398,

2019 WL 7945223, at *2 (S.D. Fla. 2019) (rejecting argument that defendant could not be individually liable for tortious acts committed in his capacity as a corporate officer) (citing *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631 633 (Fla. 4th DCA 2005) ("It is well-settled . . . that individual officers and agents of a corporation may be held personally liable for their tortious acts, even if such acts were committed within the scope of their employment as corporate officers.")).

Accordingly, Plaintiffs are entitled to default final judgment against Defendants on Plaintiffs' fraudulent misrepresentation claim.

C. **Default Final Judgment on Plaintiffs' Promissory Estoppel Claim**

Under Florida law, the elements of a claim for promissory estoppel are: (1) "the plaintiff detrimentally relied on the defendant's promise," (2) "the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance by the plaintiff," and (3) "injustice can only be avoided by enforcement of the promise." *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1291 (S.D. Fla. 2021) (quotation marks omitted). A promissory estoppel claim may be brought in parallel with a breach of contract claim where the contract does not cover the disputed promises. *See ConSeal Int'l*, 2020 WL 4736203 at *8.

Plaintiffs have stated a claim for promissory estoppel. Both Defendant FCC and Defendant Jeffrey Nahom, individually, each promised to repay Plaintiffs for the amounts plaintiffs paid directly to MSC to cover Defendants obligations to MSC. ECF No. [1] ¶¶ 55–57, 85. It is clear from the context of these statements that Defendants reasonably expected that their promises would induce Plaintiffs to make these payments to MSC. Plaintiffs did, in fact, rely on these promises and made the payments. *Id.* ¶¶ 58, 69, 87. Finally, because Plaintiffs do not have a

contractual remedy to recover those amounts, injustice can be avoided only by holding Defendants accountable for those promises.

Accordingly, Plaintiffs are entitled to default final judgment as to liability against Defendants on Plaintiffs' promissory estoppel claim. Because the damages asserted under this claim already have been awarded under Plaintiffs' fraudulent misrepresentation claim, to avoid any duplicative damages, no further damages shall be awarded for this claim.

### D. Default Final Judgment on Plaintiffs' Unjust Enrichment Claim

"A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Gr., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012). Similar to a promissory estoppel claim, an unjust enrichment claim exists only where a plaintiff does not have a remedy for breach of contract. *See Fagan v. Centr. Bank of Cyprus*, No. 19-cv-80239, 2021 WL 2845034, at *14 (S.D. Fla. June 28, 2021).

Plaintiffs have stated a claim for unjust enrichment against FCC. Plaintiffs conferred a benefit on FCC by paying money that FCC owed to MSC. Specifically, Plaintiffs paid MSC $251,371.62 on March 6, 2023, and then $17,738.91 on April 6, 2023. ECF No. [1] ¶¶ 58, 95, 97. Both of those payments should have been made by FCC, but Plaintiffs paid them to ensure that Miami Dolphins fans received the rooms and amenities they were promised. *Id*. ¶¶ 57-58, 63. Defendant FCC retained the benefit of Plaintiffs' payments for FCC's obligations to MSC. *Id*. ¶ 94. It would be inequitable to allow FCC to retain the benefit of those payments in these circumstances. *Id*. ¶¶ 95, 98. Plaintiffs' claim for unjust enrichment of $269,110.53 for payments

10

that Plaintiffs made to MSC is separate and apart from Plaintiffs' breach of contract claim against FCC.

Accordingly, Plaintiffs are entitled to default final judgment against Defendant FCC on Plaintiffs' unjust enrichment claim. As with the promissory estoppel claim, damages asserted under Plaintiffs' unjust enrichment claim already have been awarded under Plaintiffs' fraudulent misrepresentation claim. Thus, to avoid duplicative damages, no further damages shall be awarded for this claim.

### E. The Court May Award Damages Without a Hearing

"If the admitted facts in the Complaint establish liability, then the Court must determine appropriate damages." *Ordonez v. Icon Sky Holdings* LLC, No. 10-cv-60156, 2011 WL 3843890, at *5 (S.D. Fla. Aug. 30, 2011). "[W]here all the essential evidence to determine damages is on the paper record, an evidentiary hearing on damages is not required." *CreeLED, Inc. v. Individuals*, No. 23-cv-21063, 2023 WL 2915853, at *2 (S.D. Fla. Apr. 12, 2023) (citing *SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005) ("Rule 55(b)(2) speaks of evidentiary hearings in a permissive tone . . . no such hearing is required where all essential evidence is already of record." (citations omitted)).

As shown above, the relevant damages are included in the record. Further, Plaintiffs have submitted with their motion a Declaration detailing those amounts. *See* ECF No. [17-1]. Thus, the an award of damages without a hearing is proper.

### F. Award of Pre- and Post-Judgment Interest

Under Florida law, a successful plaintiff is entitled to both pre- and post-judgement interest in order to fully compensate "the plaintiff for having been deprived of the use of the principal loss amount." *Becker Holding Corp. v. Becker*, 78 F.3d 514, 516 (11th Cir. 1996); *see also Bel-Bel*

11

*Int'l Corp. v. Comty. Bank of Homestead*, 162 F.3d 1101, 1110 (11th Cir. 1998) ("A prevailing party in entitled, under Florida law, to prejudgment interest."). "The Chief Financial Officer of Florida sets the prejudgment interest rate quarterly. *See* Fla. Stat. §§ 687.01 and 55.03. The effective prejudgment interest rate "is the rate effective at the time of entitlement." *Gov't Emps. Ins. Co.*, 2023 WL 2432339, at *4.

Plaintiffs have requested $18,757.33 in prejudgment interest. Plaintiffs explain:

> The prejudgment interest calculation uses an interest rate of 5.52%, is based on the Dolphins Parties' entitlement to $280,000 on February 10, 2023, $150,000 on February 13, 2023, $150,000 on February 20, 2023, $251,371.62 on March 7, 2023, and $17,738.91 on April 10, 2023, and assumes judgment will be entered on July 17, 2023.

ECF No. [17] at 25 n.6.

The Court finds Plaintiffs' basis and calculation for prejudgment interest to be reasonable. However, Plaintiffs have not delineated what portion of this prejudgment interest is attributable to Defendant Jeffrey Nahom. Because Defendant FCC is liable for all damages in this case, but Jeffrey Nahom is only liable for $269,110.53, the Court holds FCC solely liable for the full amount of prejudgment interest of $18,757.33.

Further, Plaintiffs may recover post-judgment interest on the federal default final judgment in accordance with 28 U.S.C. § 1961.

### G.   Award of Attorneys' Fees

Plaintiffs request attorneys' fees against FCC in the amount of $68,910.86, representing 134.1 hours billed by Plaintiffs' counsel at an average rate of $513.88, after Plaintiffs' counsel applied discounted rates and made other discretionary adjustments to their invoices. ECF No. [17-2].

Case No. 23-cv-21514-BLOOM/Otazo-Reyes

Pursuant to the terms and conditions of Plaintiffs' Sponsorship Agreement with Defendant FCC, a prevailing party "shall be entitled to an award of its expenses, including reasonable attorney's fees and disbursements, incurred before and at trial." *See* ECF No. [1-4] at A-4. A prevailing party is "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001); *see Pas Consulting Grp., LLC v. Dynamic Int'l Airways*, LLC, No. 17-cv-21059, 2017 WL 7355326, at *2 (S.D. Fla. May 25, 2017) ("The contract between the parties requires Defendant to reimburse Plaintiff for attorney's fees and costs.").

The Eleventh Circuit has established a framework for assessing the reasonableness of attorneys' fees. *See Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988). First, a district court must determine a lodestar figure by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Id.* at 1299; *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours expensed on litigation multiplied by a reasonable hourly rate."); *Cuban Museum of Arts & Culture, Inc. v. City of Mia.*, 771 F. Supp. 1190, 1191 (S.D. Fla. 1991) ("[T]his court must being by calculating the lodestar, the hours reasonably expended by counsel multiplied by a reasonable hourly rate.").

The party applying for attorneys' fees has the burden of submitting satisfactory evidence to establish both that the requested rate and hours are reasonable. *Norman*, 836 F.2d at 1303. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services, by lawyers of reasonable comparable skills, experience, and reputation." *Id.* at 1299.

After calculating the lodestar fee, the court then analyzes whether that amount should be adjusted upward or downward, which determination may depend on a number of factors, including

13

the quality of the results and representation in the litigation. *Id.* at 1302. "If the result was excellent, then the court should compensate for all hours reasonably expended." *Id.* (quoting *Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th Cir. 1987)).

The Court has carefully reviewed Plaintiffs' requested attorneys' fees and accompanying exhibits. In determining the appropriate hourly rate for Plaintiffs' attorneys, the Court considers the factors elucidated in *Norman*, other relevant case law, and its own knowledge and experience. In the opinion of the Court, in light of the above factors, the requested rates are reasonable. The Court further concludes that because Plaintiffs achieved the full measure of success sought, the award of fees "will encompass all hours reasonably expended on the litigation[.]" *Hensley*, 461 U.S. at 435.

Accordingly, the Court awards to Plaintiffs and against FCC the amount of $68,910.86 for the attorneys' fees requested.

### H.     Taxable Costs

Plaintiff also seeks $717.00 in taxable costs, consisting of the case filing fee ($402.00) and the costs for service of process of the summonses and complaint on Defendants ($315.00).

Federal Rule of Civil Procedure 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "Such costs, however, may not exceed those permitted." *Mathews v. Crosby*, 480 F.3d 1265, 1277 (11th Cir. 2007).

After a review of the materials submitted by Plaintiffs, the Court finds that the requested costs are reasonable and recoverable. *See Goodman v. Sperduti Enters.*, No. 08-cv-62096, 2009 WL 3200681, at *3 (S.D. Fla. Oct. 6, 2009) ("There is no question that Plaintiff is entitled to the cost of the filing fee because it falls into one of the categories of reimbursable costs under 28

U.S.C. § 1920[.]"); *EEOC v. W & O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000). Accordingly, Plaintiff is entitled to recover $717.00 in taxable costs.

IV. **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion for Default Final Judgment, **ECF No. [17]**, is **GRANTED**.

2. The Court will enter final judgment by separate order, in accordance with Federal Rule of Civil Procedure 58.

**DONE AND ORDERED** in Chambers in Miami, Florida, on July 17, 2023.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

First Class Cruises, LLC and Jeffrey Nahom
154 Jericho Valley Dr.
Newtown, PA 18940